[No. A048658. First Dist., Div. Three. Nov. 15, 1990.]

PACIFIC BELL, Plaintiff and Appellant, v.
CALIFORNIA STATE AND CONSUMER SERVICES AGENCY et al., Defendants and Respondents;
GTEL, Real Party in Interest and Respondent.

108

COUNSEL

Pillsbury, Madison & Sutro, C. Douglas Floyd, Ronald E. Van Buskirk, Pauline Fox, Nossaman, Guthner, Knox & Elliott, William T. Bagley and Jose E. Guzman, Jr., for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Richard M. Frank, Floyd D. Shimomura and Daniel G. Stone, Deputy Attorneys General, for Defendants and Respondents.

Lillick & McHose, Charles E. Patterson, Jeffrey A. Rich and Robert A. Gutkin for Real Party in Interest and Respondent.

OPINION

STRANKMAN, J.—The California Department of General Services (DGS) announced its intent to award a contract worth over $109 million to GTEL, a California corporation, for the acquisition of a new state telecommunications system known as CALNET. Pacific Bell then filed a petition for writ of mandate and complaint for declaratory relief, seeking invalidation of that award and other related relief. Judgment was entered denying the petition, and Pacific Bell has appealed. At issue is whether the DGS violated Public Contract Code section 12102, subdivision (c), when it solicited proposals for acquisition of the system by purchase only and excluded any proposals for acquisition by lease.[1] We conclude that the DGS complied with statutory requirements, and affirm the judgment.

*Factual and Procedural Background*

The telecommunications division of the DGS is responsible for telecommunication services to state departments and other public agencies. Among the service networks it has provided through contracts is the automatic telecommunications switching system (ATSS), serving over 200,000 users in 120 agencies through 3 network switches. The ATSS system has been operated under a lease agreement with Pacific Bell and American Telephone & Telegraph Company (AT&T), which utilizes Pacific Bell facilities. The state has been Pacific Bell's largest California customer; as of November 1989, its Pacific Bell phone bill was approximately $1,510,000 per month. The current lease will expire by 1991.

---

[1] Unless otherwise indicated, all statutory references are to the Public Contract Code.

For several years, the DGS recognized the need for improving these and other telecommunications services. The 1984 divestiture and deregulation of the telephone industry and the costly proliferation of separate, independent data transmission facilities by state agencies eventually led the state to decide on development of a replacement telecommunications system. Among the studies and reports which analyzed the existing system and recommended changes was a 1986 engineering analysis, the W & J study.

The W & J study identified three available alternatives: (1) continue the operation of the present lease system using Pacific Bell facilities; (2) select AT&T as the prime supplier and network facility manager; or (3) negotiate a facility management contract under which the state would procure and operate its own telecommunications system. The consultants recommended the third alternative, which they estimated would save the state $1.9 to $20.6 million over a five-year period.

In June 1987, the DGS issued a request for information (RFI), asking the telecommunications industry to respond with solutions for the state's needs. On September 28, 1987, the state released its CALNET request for proposal (RFP), a lengthy document asking vendors to provide conceptional proposals, detailed technical proposals, and draft proposals for acquisition of a new system. The CALNET RFP was structured as a fixed price installment purchase. The declaration of Allan G. Tolman, DGS deputy director, states in part, "As Deputy Director of the Department of General Services and acting with the delegated authority of the Director, I approved the decision to write an RFP for the purchase rather than lease of the CALNET system because the long useful life of the equipment (20 years) made leasing economically impracticable."

Pacific Bell was among those sent a copy of the RFP. On October 15, 1987, Pacific Bell wrote to the state asking several questions, including whether a bid would be deemed nonresponsive which proposed a system provided under a lease.[2] On December 8, 1987, the state responded that a proposal for a lease would not comply with the RFP as written. The RFP contained a provision, section 2.2.4, for bidders to request changes in its requirements.[3] Pacific Bell did not request a change.

---

[2] Divestiture and deregulation of the telephone industry was compelled by an August 1982 modified final judgment entered in United States District Court for the District of Columbia. It is undisputed that under the terms of that judgment, Pacific Bell was precluded from selling telecommunications equipment at the time the RFP was issued.

[3] In pertinent part, section 2.2.4 provided: "If the bidder believes that one or more of the IFB/RFP requirements is onerous, unfair, or imposes unnecessary constraints to the bidder in proposing less costly or alternate solutions, bidder may request a change to the IFB/RFP by submitting, in writing, the recommended change(s) and the facts substantiating the belief

In the meantime, the state was negotiating contract language with each of the other vendors submitting proposals. Vendors were required to provide financing because the state could only pay in monthly installments. Each vendor proposed a different financing alternative: financing internally, financing through a private party, or selling public certificates of participation. Draft proposals were submitted; finally, in February 1989, final proposals were received from AT&T, EDS Federal Corporation, and GTEL. In June 1989 the state released its CALNET evaluation and selection report, evaluating costs over 10 years, including purchase, installation, financing, training, operations, and maintenance. The costs were as follows: EDS—$102,623,322; GTEL—$109,266,196; AT&T—$155,777,153. The EDS proposal contained material deviations and was rejected. On June 16, 1989, the state announced its intent to award to GTEL.

AT&T and Pacific Bell filed statements of protest with the State Board of Control.[4] Among AT&T's arguments was that the DGS was required by section 12102, subdivision (c), to request proposals for leased systems. Pacific Bell was informed that the basis for its protest was not within the board's jurisdiction; later, Pacific Bell's request to intervene in the protest of AT&T was denied, on the ground that it was not an interested party since it had not submitted a final bid in response to the CALNET RFP. After a hearing, the administrative law judge recommended denial of AT&T's protest. The Board of Control adopted the administrative law judge's opinion.

In October 1989, Pacific Bell filed a petition for writ of mandate and complaint for declaratory and injunctive relief, seeking to set aside the notice of intent to award the CALNET contract. It also sought an order directing the state to solicit lease and lease-purchase financing alternatives in the CALNET RFP, should it be reissued, and enjoining the state from refusing to solicit RFP's for state telecommunications goods and services which contain lease or lease-purchase financing alternatives. Named as respondents and defendants were the DGS, which is a department of the California State and Consumer Services Agency, that agency itself, and three DGS officials, Tolman, W. J. Anthony, and John S. Babich. GTEL was named as real party in interest.

Pacific Bell alleged that in structuring the CALNET RFP to require the submission of purchase-only financing alternatives, the state violated its

and reasons for making the recommended change. Such request must be submitted to the Department Official by the date specified in Section 1 for submitting a request for change."

[4] EDS submitted a notice of intent to protest the award, but later formally withdrew that protest.

mandatory duties under section 12100 et seq. An alternative writ was issued staying the award of the CALNET contract until the hearing on the petition. As their returns to the alternative writ, GTEL filed a demurrer and supporting declarations, and the state parties filed an answer and supporting declarations. They urged that the state had complied with the applicable statutory requirements, that Pacific Bell had waived its right to challenge the CALNET RFP because it failed to file a timely request to change or protest that RFP, and that Pacific Bell's request should be denied on the ground of laches. After a hearing, the trial court denied the petition for writ of mandate and terminated the stay. No request for a statement of decision was filed and the judgment does not specify the basis of the court's ruling.

*Section 12102, Subdivision (c)*

The Public Contract Code attempts to collect all public contract law into one code. (§ 100.) In 1982, the Legislature enacted section 12100 et seq., establishing separate authority and procedures for acquisition of electronic data-processing goods and services. (Stats. 1982, ch. 513, § 4, p. 2292.) The sections were amended in 1984 to encompass the acquisition of telecommunications goods and services as well. (Stats. 1984, ch. 728, §§ 1-8, pp. 2667-2671.) Section 12100 explains the Legislature's purpose, stating in pertinent part: "The Legislature finds that the unique aspects of electronic data-processing systems and telecommunications systems and the importance of such systems to state programs warrant a separate acquisition authority for electronic data processing and telecommunications goods and services. The Legislature further finds that such separate authority should enable the timely acquisition of goods and services in order to meet the state's needs in the most cost-effective manner."

All contracts for the acquisition of such services and goods, whether by lease or purchase, are to be made by or under the supervision of the DGS. (§ 12100.) Section 12102, subdivision (b)(1), states that contract awards shall be based on "[t]he proposal which provides the most cost-effective solution to the state's requirements, as determined by the evaluation criteria contained in the solicitation document. These evaluation procedures may provide for the selection of a vendor on an objective basis other than cost alone." (See generally, *San Diego Service Authority for Freeway Emergencies v. Superior Court* (1988) 198 Cal.App.3d 1466, 1469-1470 [244 Cal.Rptr. 440].)

Subdivision (c) of section 12102 states: "Evaluation of bidders' proposals for the purpose of determining contract award shall provide for consider-

ation of a bidder's best financing alternative unless the acquiring agency can demonstrate to the satisfaction of the Department of General Services that a particular financing alternative should not be so considered."

■ The meaning of section 12102, subdivision (c), is the heart of this appeal. Pacific Bell assumes that leasing and purchasing are financing alternatives within the meaning of that subdivision. The company interprets the statute to mean that the DGS cannot exclude a particular financing alternative such as a lease from the bidding process, as was done by the CALNET RFP. According to Pacific Bell, bidders must be allowed to propose any financing alternative, including a lease, before the acquiring agency attempts to make a "demonstration" to DGS to eliminate a particular alternative from further consideration. Pacific Bell reasons that whether a particular financing alternative such as a lease can meet the state's needs cannot be known until its specifics have been proposed by bidders and its terms analyzed in competition with other proposals.

Respondents, on the other hand, argue that the statute gives the DGS discretion to exclude a particular financing alternative from the bidding process entirely. As respondents read the statute, when the state has decided to acquire telecommunications equipment, section 12102, subdivision (c), ordinarily requires permitting all bidders to submit their " 'best financing alternative,' " including both lease and purchase proposals, unless the acquiring agency can demonstrate to the satisfaction of the DGS *before* bids are solicited that a particular financing alternative should not be considered.

■ A reviewing court faced with a question of statutory interpretation must ascertain the intent of the Legislature to effectuate the purpose of the law. The words of the statute must be considered first, and the statute given effect according to the usual, ordinary import of its language. If possible, significance must be given to every word, phrase, and sentence, and a construction making some words surplusage must be avoided. (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658-659 [147 Cal.Rptr. 359, 580 P.2d 1155].) "Statutes are to be given a reasonable and commonsense interpretation consistent with the apparent legislative purpose and intent 'and which, when applied, will result in wise policy rather than mischief or absurdity.' [Citation.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1392 [241 Cal.Rptr. 67, 743 P.2d 1323].) ■ Furthermore, when an administrative agency is charged with enforcing a particular statute, its interpretation is entitled to great weight and will be followed unless clearly erroneous or

unauthorized. (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668-669 [150 Cal.Rptr. 250, 586 P.2d 564]; *Wilkinson* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848].)

 The language of section 12102, subdivision (c), supports respondents' interpretation of its requirements. That interpretation is reasonable and gives meaning to the entire subdivision, including the "unless" clause. Had the Legislature intended to prevent an agency from ever excluding a particular financing alternative from the bidding process, it would not have added the exception set forth in the "unless" clause. The subdivision, including its qualifying clause, is not reasonably susceptible to Pacific Bell's strained analysis of its meaning.[5]

Respondents' interpretation of the statute is reinforced by its legislative history, which is among the factors which may be considered in attempting to ascertain legislative intent. (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1387.) When looking at legislative history, courts generally will not consider the views of the legislator who authored a statute, because there is no guaranty that those who supported the proposal shared that view of the legislative purpose. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].) Similarly, courts will generally give little if any weight to the declaration of a legislative employee who helped draft a particular statute. (*Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 311, fn. 8 [118 Cal.Rptr. 473, 530 P.2d 161].) On the other hand, excerpts from testimony at public legislative hearings which preceded the enactment of a statute may be of some relevance in ascertaining legislative intent. (See *Maggio* v. *Agricultural Labor Relations Bd.* (1987) 194 Cal.App.3d 1329, 1333 [240 Cal.Rptr. 195]; *Post* v. *Prati* (1979) 90 Cal.App.3d 626, 634 [153 Cal.Rptr. 511]; see also *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 [167 Cal.Rptr. 584, 615 P.2d 1372] [declaration of former chairman of California Constitution Revision Commission about discussions at commission hearing concerning proposed constitutional provision later enacted].) In addi-

---

[5] The state respondents also urge that the state's decision to operate its own telecommunications system with its own equipment was a policy decision based on what the state wanted, not a "mere choice" between financing alternatives within the meaning of the statute. Although not stated explicitly, the state respondents' position seems to be that section 12102, subdivision (c), is simply inapplicable here because no choice between financing alternatives was made. If that is the argument, it is unconvincing. The state decided to acquire telecommunications goods and services by purchase, not by lease; that decision was unquestionably a choice between financing alternatives as well as a policy decision, and compliance with section 12102, subdivision (c), was required.

tion, a legislative staff analysis of a measure may be relevant to ascertaining legislative intent when the analysis is consistent with a reasonable interpretation of the enactment. (*American Tobacco Co.* v. *Superior Court* (1989) 208 Cal.App.3d 480, 487-488 [255 Cal.Rptr. 280].)

In late 1979, before sections 12100 and following were enacted, the Senate Finance Committee of the Legislature held hearings on the state's data processing equipment procurement practices. Among the witnesses was Robert Del Agostino, a state legislative analyst, who testified about the difference between acquisitions by lease or purchase under existing law and procedures. Under the inflexible invitation for bid process (IFBP), the state specified its needs exactly, and any bids which varied from the specifications were rejected. In contrast, the request for proposal process (RFPP) permitted more general specifications, and allowed for more consideration and negotiation of vendor proposals. While leases could be solicited by either an IFBP or the more flexible RFPP, solicitation of proposals for equipment purchase was limited to the inflexible IFBP process. Del Agostino's view was that a more flexible control and acquisition process was needed.

Del Agostino was also author of a September 1979 report from the Office of the Legislative Analyst on issues in procurement of electronic data processing equipment in California state government, which recommended the establishment of a new and separate statutory authority to govern the acquisition and disposal of electronic data processing (EDP) equipment. The report criticized existing administrative policy which required determining whether to lease or purchase before initiating the procurement process, whether for a single item of equipment or an entire system. The report stated, "As discussed below, it is *not always desirable* to make this determination in advance because in many cases, exploration of acquisition alternatives with various vendors can result in a more cost-effective solution than would otherwise have been contemplated." (Italics added.) Emphasizing the need for flexibility in and adequate controls over the acquisition process, the report made several recommendations about the content of statutes and administrative regulations pertaining to equipment procurement. Under the heading, "Consideration of Vendor's Best Financial Plans," the report stated, "Section 4 of the Budget Act requires the Department of Finance to '. . . maintain in the State Administrative Manual procurement and contracting guidelines . . . which provide sufficient flexibility to enable the state to obtain contracts which take advantage of the vendor's best financing alternative while at the same time ensuring that reasonable protection for the state is not compromised.' However, section 5207 of the State Administrative Manual requires agencies to perform a cost analysis of leasing versus

purchasing *before* initiating the acquisition. We believe that the intent of Section 4 and the best interests of the state would be better served if acquiring agencies were allowed to consider vendors' financing proposals *as a part of the acquisition process*. This would enable a determination of whether to lease or purchase based on accurate and current information."

■ Pacific Bell's interpretation of section 12102, subdivision (c), would mandate consideration of proposals for both lease or purchase of equipment as part of the acquisition process under every circumstance. However, nothing in the foregoing legislative history indicates that a shift from one inflexible system to another was intended; instead, it supports a conclusion that the Legislature sought to establish a more flexible acquisition system than previously existed by permitting, but not requiring, consideration of the financing alternatives during the bidding process.

Pacific Bell urges that its interpretation of the statute is bolstered by a recent affidavit from Legislative Analyst Del Agostino, quoting from the 1979 report and then stating, "What I specifically intended by the foregoing language was that the State should state what it wants and then allow vendors to respond to the State's needs and then be able to suggest any number of different ways for the State to 'finance' what it wanted . . . . My intention in proposing specific financial characteristics for new, EDP procurement legislation, was to remove any constraints on the State's side which prohibited vendors from proposing creative financing alternatives, and permitting vendors to propose any and all financial alternatives which could meet the State's needs in the most cost-effective manner." He further declares that the language of the code section accurately expresses his intentions. As we have already stated, however, little if any weight can be given to an after-the-fact interpretive declaration of a legislative employee who helped draft a particular statute, when there is no showing that the views expressed in the declaration were before the legislative body. (*Carmona* v. *Division of Industrial Safety*, *supra*, 13 Cal.3d at p. 311, fn. 8.) Here, to the extent Del Agostino's declaration implies that the statute was intended to mandate consideration of lease and purchase alternatives as part of every acquisition process, that declaration is inconsistent with what was presented to the Legislature.

Pacific Bell also urges that case law supports its interpretation of the statute, but *Landsborough* v. *Kelly* (1934) 1 Cal.2d 739, upon which the company relies, is inapposite. In *Landsborough*, a supplier of Portland cement challenged the legality of a procurement procedure for highway con-

struction that specified the use of asphalt concrete pavement. A recently enacted statute provided that if the Department of Public Works determined that conditions did not require the use of a particular type of pavement, its specifications should call for bids based on the use of alternate paving materials. The court held that the procurement procedure violated the statute. It rejected the state's argument that precompetition engineering reports had determined that the use of Portland cement would be too costly. Such reasoning, the court explained, would nullify the effect of the statute, which was intended to make the choice of pavement the result of free, competitive bidding. (*Id.*, at pp. 744-745.) *Landsborough* is of no help to Pacific Bell because the statutory procedure in that case is dissimilar on its face to that now in dispute. As we have already discussed, the statute at issue in the present case does explicitly permit the choice between lease and purchase to be made before inviting requests for proposals, and does not require that choice to be made in the bidding process in every instance.

### The Decision to Purchase

■ Pacific Bell argues in the alternative that even if a precompetition determination not to consider leasing was legally permissible, no determination within the meaning of section 12102, subdivision (c), was ever made by the DGS. The argument is without merit, as it ignores the standards governing the issuance of a writ of mandamus.

Mandamus is issued "to compel the performance of an act which the law specially enjoins . . . ." (Code Civ. Proc., § 1085.) ■ Two requirements are essential: a clear, present and usually ministerial duty upon the part of the respondent, and a clear, present and beneficial right in the petitioner to performance of that duty. (*Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 863 [132 Cal.Rptr. 464, 553 P.2d 624].) Mandamus is an appropriate remedy to compel the exercise of discretion by a government officer, but does not lie to control the exercise of discretion unless under the facts, discretion can be exercised in only one way. (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 205 [211 Cal.Rptr. 398, 695 P.2d 695]; *Anderson* v. *Phillips* (1975) 13 Cal.3d 733, 736-737 [119 Cal.Rptr. 879, 532 P.2d 1247].)

■ As we have already explained, section 12102, subdivision (c), provides that evaluation of bidders' proposals shall provide for consideration of a bidder's best financing alternative "unless the acquiring agency can demonstrate to the satisfaction of the [DGS] that a particular financing alternative should not be so considered." The statute does not state how that

demonstration is to be made; no particular procedure is specified. The use of the term "satisfaction" makes it apparent that the statute invests the DGS with discretion to determine when a particular financing alternative should be excluded from the bidding process. No showing has been made here which would permit this court to conclude that the DGS abused its discretion when it structured the CALNET RFP as a purchase-only proposal.

The record includes the declaration of Janis Briggs from the DGS Office of Procurement, the procurement officer responsible for managing the CALNET procurement. She declared: "In August 1987, the Telecommunications Division (TD) came to me with its plan to procure a CALNET system. Rather than continue to lease equipment located at Pac Bell, TD had decided, based on previous studies, to have the switches and network management equipment located on State premises under the State's control. Based on my past Office of Procurement experience, purchase appeared to be the cost-effective solution, as the useful life of the equipment was estimated at 20 years. Vendors that I have worked with have not been able to offer the State a more cost-effective lease financing alternative when the State intended to use the equipment for as long as ten years. The State needed to make payments in monthly installments, as the funding for this project comes from the current monthly payments that agencies have budgeted for the current ATSS system provided by Pacific Bell and AT&T. Therefore, I decided to structure the RFP document as an installment purchase."

As we have already noted, the record also includes the declaration of DGS Deputy Director Tolman, who approved the decision to structure the CALNET RFP as an installment purchase because the long useful life of the equipment made leasing economically impracticable.

Given that evidence, Pacific Bell has not established any abuse of discretion by the DGS.

Finally, respondents also urge that the petition for writ of mandate was properly denied because Pacific Bell failed to exhaust its administrative remedy and because its claim was barred by laches. Our conclusion that Pacific Bell's interpretation of section 12102 is erroneous makes consideration of these issues unnecessary.

*Disposition*

Judgment is affirmed.

Merrill, J., Acting P. J., and Haning, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.