[No. B208614. Second Dist., Div. Seven. Jan. 20, 2009.]

HERMELINDA AGUIAR et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CINTAS CORPORATION NO. 2 et al., Real Parties in Interest.

**COUNSEL**

Altshuler Berzon, Michael Rubin, Eve H. Cervantez, Eileen B. Goldsmith and Jamie L. Crook for Petitioners.

No appearance for Respondent.

Squire, Sanders & Dempsey, Mark C. Dosker, Diane L. Gibson, Michael W. Kelly and Casey J. T. McCoy for Real Parties in Interest.

## OPINION

**PERLUSS, P. J.**—In 1997 the City of Los Angeles adopted a living wage ordinance (LWO) prescribing a minimum level of compensation for employees of private firms who work on service contracts benefiting the city. (L.A. Admin. Code, § 10.37 et seq.) The ordinance provides an employee is eligible for LWO wages and benefits if he or she "expends any of his or her time" on a city service contract. (L.A. Admin. Code, § 10.37.1, subd. (f).) Former regulation No. 5 (Regulation 5), promulgated by the city agency entrusted with implementing the LWO, provided, prior to its rescission in 2006, if an employee of a private contractor works at least 20 hours during the month on a city service contract, he or she must be paid the appropriate wages mandated by the LWO for each hour worked on the subject agreement. If, however, the employee works less than 20 hours per month on a city service contract, he or she is not eligible for any LWO wages. Do Regulation 5's 20-hour rule and hours-worked component limiting LWO wages to the time actually spent on a city service contract conflict with the LWO?

■ The plain language of the LWO, coupled with its legislative history, reflect an unmistakable intent to afford a living wage to employees of city service contractors who spend any time working on city service contracts, no matter how much or how little that participation may be. By limiting LWO eligibility to those who work 20 hours a month or more on city contracts and the amount of LWO wages to the hours actually spent on the city contract, Regulation 5 directly conflicts with the LWO's articulated remedial purpose of raising wages for low wage service workers and ameliorating the burden placed on city social services caused by payment of inadequate compensation. Because the trial court erred in concluding Regulation 5 was a valid and enforceable clarification of the LWO, we grant the petition for writ of mandate filed in this class action lawsuit by Hermelinda Aguiar, Alicia Maria Aldrete, Aurora Banuelos, Maria Alicia Gonzalez and Josefina Contreras on behalf of themselves and all others similarly situated (collectively plaintiffs) and direct respondent Los Angeles Superior Court to vacate its order upholding Regulation 5 and to enter a new and different order invalidating Regulation 5 on the ground it conflicts with the LWO.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

#### 1. *Cintas Corporation's Contract with the City*

Cintas Corporation No. 2 and Cintas Corporation No. 3 (collectively Cintas) lease and launder garments and other goods for their customers. In

---

[1] This factual recitation borrows liberally from our prior published decision in *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121 [50 Cal.Rptr.3d 135] (reversing the trial court's denial of class certification in this case).

1999 and again in 2003 the city awarded Cintas a contract to lease and launder flame-retardant uniforms and other items for use by employees of the Los Angeles Department of Water and Power (DWP). Under each contract Cintas was required to pick up soiled uniforms and materials, such as dustrags, towels and blankets, used by DWP employees from numerous DWP locations, launder the items, make any necessary repairs and return them to their respective DWP site. Items generally were picked up from DWP sites each business day and returned clean within a week of receipt. Cintas used its Whittier, Pico Rivera and Ontario facilities at various times to process the DWP items. Each contract required Cintas to comply with the LWO for all covered employees, including the salary, vacation and sick time and notification provisions. For each contract Cintas signed a declaration of compliance, certifying it would comply with the LWO. The city terminated its contract with Cintas for cause on January 28, 2004.[2]

## 2. The Class Action Lawsuit by Cintas's Employees

In 2004 a group of Cintas employees sued Cintas alleging it had failed to properly compensate them under the LWO and the Labor Code. The complaint was amended in March 2004 to name the current plaintiffs and include allegations that plaintiffs represented not only themselves individually, but also "a class of [Cintas's] current and former employees [of its Whittier, Pico Rivera and Ontario facilities] who have worked at least 20 hours per month on [Cintas's] contracts to provide rental, uniform and laundry services to the DWP." On January 24, 2005 plaintiffs filed a second amended complaint in which they reiterated most of their class action allegations, but eliminated the allegation restricting the proposed class to workers who had spent at least 20 hours per month performing services on the DWP contracts. In conjunction with the second amended complaint, plaintiffs also filed a motion to certify the proposed class, consisting of more than 300 production and stockroom workers at Cintas's Whittier, Pico Rivera and Ontario facilities during the period from May 1, 2000 (the effective date of Cintas's original contract with the DWP) to January 29, 2004 (the date the city terminated its contract with Cintas).

---

[2] By letter dated January 21, 2004 the city informed Cintas it was terminating the contract for cause as of January 28, 2004 because Cintas had failed to implement a system for the electronic tracking of garments and to provide fire-resistant shirts and coveralls as required by the agreement. The city subsequently sued Cintas for breach of contract and breach of the implied covenant of good faith and fair dealing, alleging that, in addition to its failure to implement the tracking system and to provide certain uniforms, Cintas had breached the agreement by "fail[ing] to pay some or all of its employees in compliance with the [LWO] as it was obligated to do." With no admission of wrongdoing, Cintas settled the matter with the city; the settlement released Cintas from any further liability to the city but provided the settlement would have no impact on the instant action. (See *Aguiar v. Cintas Corp. No. 2, supra*, 144 Cal.App.4th at p. 128, fn. 2.)

Cintas opposed the motion for class certification, arguing the named plaintiffs were not adequate class representatives and common issues of law and fact did not predominate over the individual determinations that would be required to determine who was a member of the putative class. Specifically, to demonstrate applicability of the LWO, Cintas maintained each named plaintiff and putative class member would be required to demonstrate he or she had worked at least 20 hours per month on the DWP contracts.

The trial court agreed with Cintas and denied the motion, finding the proposed class was not ascertainable, the putative class members lacked a well-defined community of interest and class adjudication was not the superior means of resolving the litigation because plaintiffs' evidence did not demonstrate substantial benefits would accrue to either the litigants or the court if the lawsuit were maintained as a class action.

### 3. *The Appeal from the Denial of Class Certification*

Plaintiffs appealed, contending the trial court had implicitly assumed the validity of Regulation 5's 20-hour rule and then used it to determine class treatment was not the appropriate means to resolve the litigation. We reversed the order denying class certification in *Aguiar v. Cintas Corp. No. 2, supra,* 144 Cal.App.4th 121 (*Aguiar I*), holding any perceived barriers to class certification identified by Cintas could easily be resolved by dividing the putative class into two subclasses: those employees who worked at least 20 hours per month on the DWP contracts and those who did not. Accordingly, we did not reach the validity of Regulation 5's 20-hour rule. (See *id.* at p. 135 ["the validity of the 20-hour rule need not be resolved at this stage of the litigation and is not a bar to class certification because the putative class can be divided into subclasses of those employees who worked at least 20 hours per month on the DWP contracts and those who did not"].)

### 4. *Repeal of Regulation 5*

In August 2006, shortly before our decision in *Aguiar I, supra,* 144 Cal.App.4th 121, the Los Angeles City Council revoked the 20-hour rule, finding it inconsistent with its earlier intent to have the LWO apply to all employees who had worked on any city contract. Regulation 5 was recinded in its entirety.[3] At the same time language in regulation No. 4 that cross-referenced both the 20-hour rule and the hours-worked limitation in Regulation 5 was deleted from the regulation.

---

[3] As the parties acknowledge, rescission of Regulation 5 does not render moot the question raised in this litigation, that is, whether the regulation was valid during the period from July 2003 (when it was promulgated) until August 2006 (when it was rescinded).

### 5. *The Third Amended Complaint and Pretrial Motions*

Following our decision in *Aguiar I, supra*, 144 Cal.App.4th 121, the trial court certified two subclasses consisting of Cintas employees who had worked at least 20 hours a month on DWP contracts and those who did not. Class notice was sent on October 23, 2007. On August 10, 2007, pursuant to a stipulation of all parties, plaintiffs filed the third amended complaint, which included an additional cause of action seeking a declaratory judgment concerning the validity of Regulation 5.

On November 9, 2007 plaintiffs moved for summary judgment or, in the alternative, summary adjudication, seeking, among other things, a judicial declaration that Regulation 5 was invalid. Cintas opposed the motion and filed its own motion for summary judgment and/or summary adjudication. The court heard and denied both motions in January 2008. With respect to the declaratory relief claim, the court found there were "factual issues that must be determined" before the validity of Regulation 5 could be resolved.

In February 2008 plaintiffs moved in limine to exclude Cintas from submitting any evidence or argument that Regulation 5 was enforceable or applicable. Cintas filed a cross-motion in limine to exclude plaintiffs from submitting any evidence or argument that the regulation was not enforceable. Both sides acknowledged the validity of the regulation was exclusively a legal issue for the court.

At a pretrial status conference the court agreed certain legal issues disputed by the parties could be resolved prior to trial, but suggested in limine motions were not the proper vehicle to present those issues. The parties then entered into a stipulation identifying the questions to be decided by the court on a jointly submitted record. Pursuant to the parties' stipulation, the trial court vacated the February 25, 2008 trial date and scheduled a hearing to decide the legal issues identified in the stipulation, including the threshold issue of Regulation 5's validity.[4]

---

[4] The parties' February 25, 2008 joint stipulation identified the following legal issues to be decided on a jointly submitted record: (1) The constitutionality of the LWO when applied outside the Los Angeles city limits; (2) whether Regulation 5 is invalid or unenforceable, in whole or in part, because it contradicts or is inconsistent with the LWO; (3) whether the LWO is unconstitutionally vague as applied to Cintas's business; (4) whether a defendant's assertion of a good faith dispute with respect to willfulness may be based on a good faith dispute raised before or during trial, or whether it must be limited to disputes known to the employer at the time it acted; and (5) whether the burden of proof will shift to Cintas for any purpose, and, if so, the extent of such burden. The stipulation provided that the issues submitted "are legal issues which the parties agree do not require determination of any material factual disputes and which are appropriately resolved by pretrial motion" and identified plaintiffs as the moving parties on the motion addressing the validity of Regulation 5.

On May 21, 2008 the trial court held the hearing and found Regulation 5 valid, concluding it "appears to properly clarify the LWO." After ruling on other pretrial motions in separate orders, the trial court set a new trial date of October 27, 2008.

### 6. *The Instant Petition for Writ of Mandate*

On June 19, 2008 plaintiffs filed a petition for a writ of mandate seeking to vacate the trial court's May 21, 2008 ruling that Regulation 5 was valid as a clarification of the LWO. On July 29, 2008 we issued an order to show cause why the trial court should not be compelled to vacate its May 21, 2008 order declaring Regulation 5 valid and enforceable in this case and ordered further proceedings in the trial court stayed pending further order of this court. On August 15, 2008 Cintas filed its return, and on August 29, 2008 plaintiffs filed their reply in support of the petition.

## DISCUSSION

### 1. *The Los Angeles Living Wage Ordinance*

The city adopted the LWO to assure a minimally adequate level of compensation for employees of service contractors who benefit from city contracts. According to the city council's legislative findings, "Experience indicates that procurement by contract of services has all too often resulted in the payment by service contractors to their employees of wages at or slightly above the minimum required by federal and state minimum wage laws. Such minimal compensation tends to inhibit the quantity and quality of services rendered by such employees to the City and to the public. Underpaying employees in this way fosters high turnover, absenteeism, and lackluster performance. Conversely, adequate compensation promotes amelioration of these undesirable conditions. Through this article the City intends to require service contractors to provide a minimum level of compensation that will improve the level of services rendered to and for the City. [¶] The inadequate compensation typically paid today also fails to provide service employees with resources sufficient to afford life in Los Angeles. It is unacceptable that contracting decisions involving the expenditure of City funds should foster conditions placing a burden on limited social services. The City, as a principal provider of social support services, has an interest in promoting an employment environment that protects such limited resources. In requiring the payment of a higher minimum level of compensation, this article benefits that interest." (L.A. Admin. Code, § 10.37.)

To achieve the goals outlined in its legislative findings, the LWO provides that all nonexempt employers who are recipients of a service contract[5] with the city must pay covered employees a specified minimum hourly rate: The initial 1997 rates were $7.25 per hour with health benefits (defined as the payment of at least $1.25 per hour toward the provision of health care benefits for employees and their dependents) or otherwise $8.50 per hour; and the ordinance provides for annual rate increases. (L.A. Admin. Code, §§ 10.37.2, subd. (a), 10.37.3.) Employers must also provide employees with 12 compensated days off per year for sick leave, vacation or personal necessity at the employee's request and, if that time is exhausted, an additional 10 days per year of uncompensated time for sick leave for the illness of the employee or a member of his or her immediate family. (*Id.*, § 10.37.2, subd. (b).) In addition, employers are required to notify employees who earn less than $12 per hour of their potential right to the federal earned income credit and make available related forms. (*Id.*, § 10.37.4.)

### 2. *Regulations Implementing the Living Wage Ordinance*

At its inception the LWO required the Los Angeles City Council by resolution to designate a department or office (the "designated administrative agency") to promulgate rules for its implementation and to otherwise coordinate administration of its requirements. (L.A. Admin. Code, § 10.37.7.) As the recipient of that designation, the Department of Public Works, Bureau of Contract Administration, Office of Contract Compliance promulgated "Rules and Regulations Implementing the Living Wage Ordinance." Regulation 5, entitled "the 20-hour rule," was one of those regulations.

By its terms, former Regulation 5 limits the situations in which an employee is entitled to the benefits of the LWO: "For purposes of the LWO and unless otherwise exempt, an employee of a service contractor . . . will be covered by the LWO if he or she works at least 20 hours during the month (a) on a service contract. . . . [¶] If an employee has worked at least 20 hours on the subject agreement during the month, the employee must be paid the appropriate LWO wage rate for each hour worked on the subject agreement during that month. The employee must also accrue compensated and uncompensated time off during that month. [¶] If the employee does not work at

---

[5] The LWO defines "service contract" as "a contract let to a contractor by the City primarily for the furnishing of services to or for the City (as opposed to the purchase of goods or other property or the leasing or renting of property) and that involves an expenditure in excess of twenty-five thousand dollars ($25,000) and a contract term of at least three (3) months; but only where any of the following applies: [¶] (1) at least some of the services rendered are rendered by employees whose work site is on property owned by the City, [¶] (2) the services could feasibly be performed by City employees if the awarding authority had the requisite financial and staffing resources, or [¶] (3) the [designated administrative agency] has determined in writing that coverage would further the proprietary interests of the City." (L.A. Admin. Code, § 10.37.1, subd. (j).)

least 20 hours on the subject agreement during the month, the employer will not be required to compensate the employee at the LWO rate for that month. The compensated and uncompensated time off requirements will also not apply for that month." (See also former regulation No. 4 ["Employers are required to pay the living wage rate to employees working on the City agreement who meet the requirements of Regulation # 5. If an employee meets the conditions stated in Regulation # 5, the employer shall pay the employee the living wage rate for each hour the employee works on the City agreement."].)

### 3. *Standard of Review*

Neither party disputes the meaning of Regulation 5. The question presented is whether Regulation 5's 20-hour rule or limitation of LWO wages to hours worked on city contracts conflicts with the LWO.

When a statute empowers an administrative agency to adopt regulations implementing the legislation, the agency acts in a "quasi-legislative" capacity, having been delegated the Legislature's lawmaking power. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) Judicial review of quasi-legislative actions is limited to the determination whether the regulation is within the scope of the authority conferred and is reasonably necessary to effectuate the purpose of the statute under which it is enacted. (See *id.* at pp. 10–11; *Woods v. Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032].) In deciding whether the regulation conflicts with its legislative mandate, the court does not defer to the agency's interpretation of the law under which the regulation issued, but rather exercises its own independent judgment. (See *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1106, fn. 7 [56 Cal.Rptr.3d 880, 155 P.3d 284] ["[w]hile the [agency's] construction of a statute is entitled to consideration and respect, it is not binding and it is ultimately for the judiciary to interpret this statute"]; *Yamaha*, at p. 11, fn. 4 ["[t]he court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued"]; see also *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2] [" '[a]dministrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations' "].)

### 4. *Regulation 5 Conflicts with the Living Wage Ordinance*

■ In interpreting the LWO we are guided by well-established principles of statutory construction. (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 290 [82

Cal.Rptr.2d 569] ["[w]e interpret ordinances by the same rules applicable to statutes"]; see *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1184 [78 Cal.Rptr.3d 572] *(Amaral)*; *Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1023 [35 Cal.Rptr.3d 487].) Our fundamental task is to ascertain the Legislature's (or, as here, the city council's) intent and thereby effectuate the purpose of the ordinance. *(Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].) We begin by examining the statutory language, giving the words their usual and ordinary meaning. *(Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) "If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' " *(Ibid.;* see *Smith,* at p. 83.)

a. *Regulation 5's 20-hour rule is inconsistent with the LWO*

■ By its terms the LWO requires employers who are recipients of a service contract with the city to pay covered "employees" LWO wages. (L.A. Admin. Code, §§ 10.37.2, subd. (a), 10.37.3.) An "employee" is defined as "any person—who is not a managerial, supervisory, or confidential employee and who is not required to possess an occupational license—who is employed [¶] (1) as a service employee of a contractor or subcontractor on or under the authority of one or more service contracts and who expends *any of his or her time thereon* . . . ." (L.A. Admin. Code, § 10.37.1, subd. (f), italics added.)

The language of the ordinance is clear: Any employee of a city service contractor who spends "any time" at all working on a city service contract subject to the LWO is eligible for LWO wages. To find otherwise would ignore the use of the term "any," resulting in a restriction not contemplated by the plain language of the ordinance. (See, e.g., *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] [statute providing that newsperson "shall not be adjudged in contempt for 'refusing to disclose *any* unpublished information' " was not limited in scope to information obtained in confidence; the word " 'any' means without limit and no matter what kind"]; *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1191 [114 Cal.Rptr.2d 459, 36 P.3d 2] [statute providing limitation period for commencement of "any judicial action" to review, set aside or annul an ordinance, resolution or motion adopting a new fee or service charge applied to tax refund action; use of the word "any" served to "broaden the applicability of the provision"].)

■   Other language in the LWO supports the conclusion the city council did not intend to limit LWO wages to those who met specific time minimums. (See *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 388 [20 Cal.Rptr.2d 523, 853 P.2d 978] [" 'various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole' "].) Specifically, in the same paragraph authorizing payment of LWO wages to employees who spend "any time" on city service contracts, the city expressly limited LWO eligibility for employees of "City financial assistance recipient[s]"—private companies receiving economic development or job growth funding from the city— authorizing LWO wages for those employees only if they "expend[] at least half [their] time on the premises of the City financial assistance recipient directly involved with the activities funded by the City." (L.A. Admin. Code, § 10.37.1, subd. (f)(4).)[6] Plainly, the city knew how to, and did, limit LWO coverage based on minimum time requirements, but elected not to impose any such restriction on employees of private companies who were awarded city service contracts. (See, e.g., *Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 583 [80 Cal.Rptr.3d 83, 187 P.3d 934] [inclusion of a good cause exception in the work product privilege statutes shows "the Legislature clearly knew how to enact a statutory good cause exception," but it "chose not to do so" in the mediation confidentiality statutes]; see also *Rojas v. Superior Court* (2004) 33 Cal.4th 407, 414 [15 Cal.Rptr.3d 643, 93 P.3d 260].)

Cintas insists Regulation 5's 20-hour rule does not conflict with the LWO, but merely serves as a "gap-filler" to "fill in the details" of the authorizing legislation. (See *Yamaha, supra*, 19 Cal.4th at p. 19 (conc. opn. of Mosk, J.) [statutory scheme may "explicitly or implicitly delegate this interpretive or 'gap-filling' authority to an administrative agency"]; *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 362 [185 Cal.Rptr. 453, 650 P.2d 328] ["An administrative agency is not limited to the exact provisions of a statute in adopting regulations to enforce its mandate. '[T]he absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority . . . .' [Citations.] The DMV is authorized to ' "fill up the details" ' of the statutory scheme."].) Yet, Cintas fails to identify where in the ordinance the purported gap exists. At best, Cintas observes that, absent a specific hour minimum in the LWO itself, there can be no conflict between the LWO and the minimum

---

[6] The LWO defines "City financial assistance recipient" as "any person who receives from the City discrete financial assistance for economic development or job growth expressly articulated and identified by the City, as contrasted with generalized financial assistance such as through tax legislation . . . ." (L.A. Admin. Code, § 10.37.1, subd. (c).) The provision further provides the city financial assistance recipient's term of compliance with the LWO is dictated by the amount of financial assistance received. (See *ibid.* [for example, assistance given in the amount of $1 million or more in any 12-month period requires compliance with the LWO for five years from the date such assistance reaches the $1 million threshold].)

time requirements in Regulation 5. Not only is this argument circular, but also it wholly disregards the term "any time" in the statute itself that denotes an express legislative intent not to impose a minimum time requirement.

■ Our conclusion the LWO was intended to apply to any employee of a private company who works on city service contracts without regard to minimum time requirements is reinforced by the legislative history of the LWO. (See *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 [33 Cal.Rptr.2d 109, 878 P.2d 1321] ["Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction. [Citation.] Nonetheless, a court may determine whether the literal meaning of a statute comports with its purpose. [Citation.] We need not follow the plain meaning of a statute when to do so would 'frustrate[] the manifest purposes of the legislation as a whole or [lead] to absurd results.' "]; see also *Day v. City of Fontana, supra*, 25 Cal.4th at p. 274 ["legislative history materials reinforce our conclusion that the statute applies to plaintiff's action"].) Prior to its enactment, the proposed draft of the LWO included a 50 percent minimum time eligibility requirement that would have limited LWO eligibility to those employees of city service contractors who expended "at least half" their time on a city service contract. At the request of the city council committee entrusted with creating the ordinance, the city attorney removed that limitation from the proposed legislation (retaining it only for employees of city financial assistance recipients) and replaced it with language authorizing coverage if the employee spent "any time" on the designated contract.[7] The codified version of the LWO approved by the city council

---

[7] Cintas correctly asserts the testimony of former City Councilmember Jackie Goldberg, who served on the city council from 1993 to 2000, is not admissible to show the intended meaning of the statute. (*Amaral, supra*, 163 Cal.App.4th at p. 1187; see also *City of Los Angeles v. Superior Court* (1985) 170 Cal.App.3d 744, 752 [216 Cal.Rptr. 311] ["By attempting to delve into the mind of the [ordinance's] principal drafter, Friedman is trying to discover what the individual members of the city council interpreted the [ordinance] to mean at the time they passed [it]. This violates one of the long-established rules of statutory construction: that the testimony of an individual legislator as to his intention, motive or opinion with regard to a particular piece of legislation is inadmissible."]; but see *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371] [statement by the sponsoring legislator may be used to show legislative intent to the extent it "evidences the understanding of the Legislature" and not simply the particular legislator's personal views].) However, the exhibits Ms. Goldberg authenticates in her declaration, including memoranda from the city attorney to the city council concerning the draft ordinance, are properly considered. (See *Southern California Gas Co. v. Public Utilities Com.* (1979) 24 Cal.3d 653, 659 [156 Cal.Rptr. 733, 596 P.2d 1149] ["[s]tatements in legislative committee reports concerning the statutory objects and purposes which are in accord with a reasonable interpretation of the statute are legitimate aids in determining legislative intent"]; *Pac. Bell v. Cal. State & Consumer Servs. Agency* (1990) 225 Cal.App.3d 107, 116 [275 Cal.Rptr. 62] ["a legislative staff analysis of a measure may be relevant to ascertaining legislative intent when the analysis is consistent with a reasonable interpretation of the enactment"].)

preserves that intended distinction between employees of city service contractors and city financial assistance recipients, reinforcing the city council's intent not to impose time limitations in connection with LWO eligibility for employees of service contractors. (See, e.g., *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 194–195 [25 Cal.Rptr.3d 298, 106 P.3d 958] [citing Legislature's deletion of conditional stay provision in anti-SLAPP (strategic lawsuit against public participation) statutes as supporting interpretation of statutes to mandate automatic stay on appeal]; *In re Mehdizadeh* (2003) 105 Cal.App.4th 995, 1004, fn. 23 [130 Cal.Rptr.2d 98] [" '[t]he rejection of a specific provision contained in an act as originally introduced is "most persuasive" that the act should not be interpreted to include what was left out' "]; *Wilson v. City of Laguna Beach* (1992) 6 Cal.App.4th 543, 555 [7 Cal.Rptr.2d 848]; but cf. *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 573, fn. 5 [21 Cal.Rptr.3d 331, 101 P.3d 140] [" '[u]npassed bills, as evidence[] of legislative intent, have little value' "].)[8]

■ The city council's subsequent repeal of the 20-hour rule to, in its words, "reaffirm [the] Council's intent to have a minimum living wage paid to all employees who work on City service contracts" is also powerful evidence of the city's intent in adopting the LWO. (See *Eu v. Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289] ["[a]lthough a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act," subsequent expressions of intent "may properly be considered together with other factors in arriving at the true legislative intent existing when the prior act was passed"]; accord, *People v. Cruz* (1996) 13 Cal.4th 764, 781 [55 Cal.Rptr.2d 117, 919 P.2d 731]; cf. *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 [276 Cal.Rptr. 114, 801 P.2d 357] ["[t]he declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law . . . when, as here, such declared intent is without objective support in either the language or history of the legislation and (until recently) is contrary as well to the practice of the affected agency"].)

■ Faced with the plain language and legislative history of the LWO, Cintas nonetheless contends interpreting the LWO to authorize a living wage to employees for "any time" spent on a city service contract would lead to absurd results. According to Cintas, "it would require a city contractor to pay employees higher hourly rates" even if they only "touched a DWP garment

---

[8] Cintas asserts the removal of the eligibility requirement that a service contractor employee spend at least 50 percent of his or her time on the contract is meaningless because it could just as easily indicate an intent to impose a lower minimum eligibility requirement. However, the legislative materials make clear the 50 percent limitation was not just omitted, but expressly disapproved in favor of a provision that authorized LWO eligibility "any time" an employee worked on the contract.

for an instant." That argument, however, ignores the employer's authority to determine the extent to which an employee works on a city contract, if at all. (See, e.g., *Amaral, supra*, 163 Cal.App.4th at p. 1187 ["[a] contractor with many employees might choose to limit its obligations [under a living wage ordinance] by segregating City contract work and assigning this work to a smaller subset of employees"].) It also disregards the LWO's express purpose, that is, to require those who procure city contracts to pay their employees who work on those contracts at a level that both fosters quality performance and ameliorates the burden placed on the city's social services caused by payment of inadequate compensation. (L.A. Admin. Code, § 10.37.) Far from "absurd," the ordinance as drafted (authorizing minimum compensation without accompanying time minimums) fulfills the city council's articulated intent. (See *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 897–898 [80 Cal.Rptr.3d 690, 188 P.3d 629] [although in rare cases the " 'literal meaning of the [statutory] words may be disregarded to avoid absurd results,' " the absurdity argument is not well taken if there also exists a "rational, nonabsurd" basis for legislation].)

### b. *The hours-worked component of Regulation 5 is not enforceable*

Regulation 5 provides that, if the employee worked at least 20 hours on the subject agreement during the month, the employee must be paid the appropriate LWO wage rate *for each hour worked* on the agreement. Similarly, regulation No. 4, in language that was also deleted in August 2006, provided, "If an employee meets the conditions stated in Regulation # 5, the employer shall pay the employee the living wage rate for each hour the employee works on the City agreement." Cintas argues that, regardless of the validity of the 20-hour rule, this contract-hours-worked aspect of Regulation 5 is fully consistent with the LWO and is severable from the 20-hour rule.

At the threshold, it is at best doubtful—and, indeed, neither party cites any case authority—that the severance doctrine is applicable to administrative regulations, as opposed to the legislation those regulations are intended to implement. (Cf. *Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d 315, 330–331 [118 Cal.Rptr. 637, 530 P.2d 605] [severance of unconstitutional portion of *statute* is possible and proper where the language of the statute is mechanically severable and " 'the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute' "]; *Long Beach Lesbian & Gay Pride v. City of Long Beach* (1993) 14 Cal.App.4th 312, 327 [17 Cal.Rptr.2d 861] [city ordinance].) Furthermore, even if severance were applicable to administrative regulations, nothing in the regulation suggests the hours-worked component was intended to stand alone in the event the 20-hour rule

was invalidated. To the contrary, although the LWO itself contains a severance clause,[9] there is no similar provision in any of the regulations implementing the LWO. (See, e.g., *Schenley Affiliated Brands Corp. v. Kirby* (1971) 21 Cal.App.3d 177, 199 [98 Cal.Rptr. 609] ["a declaration of severability, although not conclusive, is persuasive evidence of the enacting body's intent"]; cf. *Legislature v. Eu* (1991) 54 Cal.3d 492, 535 [286 Cal.Rptr. 283, 816 P.2d 1309] [severance of particular provisions is permissible despite absence of a formal severance clause if, among other things, the Legislature or voters intended the clause to stand independently had they foreseen that part of the legislation would be declared invalid].) In fact, the two portions of the regulation appear inextricably linked, with the 20-hour rule serving as the hours-worked component's necessary predicate. That is, *if* the employee works 20 hours or more a month on a city service contract, *then* the employee is entitled to LWO wages for each hour worked on the city contract. That conclusion is reinforced by the parallel language that had existed in regulation No. 4. The rescission of Regulation 5 in its entirety—without preserving the hours-worked component of the regulation—and the contemporaneous deletion of language in regulation No. 4 containing the hours-worked limitation further suggest the hours-worked component is inseparable from the 20-hour rule.

■ In any event, even if the hours worked component of Regulation 5 could be severed from the regulation's 20-hour rule, we would still find the former provision in conflict with the LWO itself. The LWO provides, "Employers shall pay employees a wage of no less than the hourly rates set [forth in] this article." (L.A. Admin. Code, § 10.37.2, subd. (a).) This language imposes a minimum hourly wage for the hours worked by the employee, not one for each hour worked by the employee on the city contract. The same is true for other compensation benefits authorized by the LWO. For example, the LWO authorizes 12 compensated days off per year as part of the LWO benefits for any covered employee. It does not require that an employee spend full time working on a city service contract to earn the compensated day off and does not reduce the compensated days off to a percentage of the time spent on the city contract. It is the employee's status as a covered employee that is determinative.

Cintas asserts, if the term "any of his or her time" in the section defining "employee" means anything, it must limit LWO payments to the amount of time spent on the city's contract. Yet, as we have explained, the term "any of his or her time" defines when an employee is LWO eligible, not the manner

---

[9] The LWO provides, "If any provision of this article is declared legally invalid by any court of competent jurisdiction, the remaining provisions shall remain in full force and effect." (L.A. Admin. Code, § 10.37.14.)

in which his or her wages are to be calculated. The amount of wages, authorized in a separate section of the LWO entitled "Payment of Minimum Compensation to Employees," contains no link between the amount of time actually worked on city service contracts and the LWO wages earned. (See L.A. Admin. Code, § 10.37.2.) To be sure, the city could have limited LWO wages to the hours an employee of a private contractor actually worked on city contracts or the city could have chosen to afford LWO eligibility to all employees of private contractors who receive city contracts without regard to whether the employee ever actually worked on the city contract (see, e.g., *Rubalcava v. Martinez* (2007) 158 Cal.App.4th 563, 568 [70 Cal.Rptr.3d 225] [city zoning ordinance setting minimum wage requirements for all city hotel workers in exchange for city financing street improvements and job training]). It did neither. Instead, the LWO provides for a living wage based on an employee's status—whether he or she worked on the city contract—without limiting those wages to the hours actually worked. (See *Amaral, supra,* 163 Cal.App.4th at p. 1186 [had city intended to include nexus between the amount of time worked on a city contract and the wages earned, it could have easily included it in the ordinance itself].)

Cintas made a similar argument in *Amaral, supra,* 163 Cal.App.4th 1157, asserting a living wage ordinance adopted by the City of Hayward dictated a minimum level of pay only for those hours the eligible employee actually worked on a city contract.[10] The First District rejected Cintas's construction of the Hayward living wage ordinance (Hayward LWO) explaining, "[N]o provision of the [Hayward] LWO limits the contractor's obligation . . . by mandating a living wage *only* for the time an employee spends performing tasks related to the service contract with Hayward. If the City [of Hayward] had intended to restrict the application of the [Hayward] LWO in this manner, it could have easily inserted the phrase 'for hours worked on the contract' in the subdivision describing the ordinance's 'Living Wage Requirements' [citation]. [Citation.] It did not." (*Amaral,* at p. 1186.) The Court of Appeal also observed the Hayward LWO also included compensated days off, but did not link those benefits to the time spent on a Hayward city contract: "If the City had intended to impose the limitation Cintas now urges, it could have stated that employees not fully engaged in work on or under a service contract would also accrue compensated days off at a proportional rate. It did not." (*Ibid.*) Although the Hayward LWO and the instant LWO are not

---

[10] As described in *Amaral,* the Hayward living wage ordinance provided: " 'Service contractors subject to this Ordinance shall pay their employees a wage of no less than eight dollars ($8.00) per hour, if health benefits are paid to the employees, or nine dollars and twenty-five cents ($9.25) per hour if no such health benefits are paid.' (Hayward Mun. Code, § 2-14.020, subd. (c).) For purposes of the ordinance, an employee is defined as 'any individual employed by a service contractor on or under the authority of any contract for services with the City . . . .' " (*Amaral, supra,* 163 Cal.App.4th at pp. 1185–1186.)

identical, they are very similar, and Cintas has provided no persuasive reason for us to depart from the First District's analysis in *Amaral*.

Unable to rely on the plain language of the LWO, Cintas once again raises its "gap filler" rationale in support of the now repealed hours-worked regulation. That is, Cintas asserts, absent any language in the LWO mandating a broad application of LWO wages as part of an employee's overall compensation without regard to the hours spent on the city contract, the regulation limiting such wages to the actual hours worked is not in conflict with the ordinance, but rather fills in its details. (See, e.g., *Ford Dealers Assn. v. Department of Motor Vehicles, supra*, 32 Cal.3d at pp. 362–363.) Yet, the regulation cannot be justified as a gap-filler when limiting LWO wages to the hours spent on the city contract would conflict with the LWO's articulated remedial purpose. (See *Day v. City of Fontana, supra*, 25 Cal.4th at p. 272.) As discussed, the LWO was adopted in recognition that service contractors benefitting from city service contracts too often paid their workers low wages, thereby inhibiting the quantity and quality of services provided to the public by those employees. The city council was also concerned that "inadequate compensation typically paid today also fails to provide service employees with resources sufficient to afford life in Los Angeles." (L.A. Admin. Code, § 10.37, pars. 2, 3.) The LWO ameliorates these conditions by mandating a minimum living wage for employees of city service contractors to "improve the level of services rendered to and for the City," raise the standard of living for such employees and thereby avoid fostering conditions that place a burden on limited social services. (L.A. Admin. Code, § 10.37, par. 2.) As we have explained, the ordinance was intended to apply to all workers who spend "any time" on a city service contract. It is difficult to conceive how the remedial purpose of raising wages and workers' standard of living is well served (or served at all) if the LWO wages are limited to the comparatively small number of hours a month a worker may spend on the city's contract. (See *Amaral, supra*, 163 Cal.App.4th at p. 1187 [interpretation that LWO requirements apply to all hours worked by employees who are covered by the ordinance and not just hours worked on a city contract is "most consistent with the remedial purpose of the law"].)

In concluding the hours worked component of Regulation 5 conflicts with the LWO, we do not suggest that Cintas's arguments that LWO wage payments be limited to those hours spent on the city contract is irrational, only that it is not consistent with the LWO's language and articulated purpose and intent. Should the city council conclude Cintas has the better of the policy arguments, it will no doubt revise the LWO to address those concerns. (See *In re Summer H.* (2006) 139 Cal.App.4th 1315, 1334 [43 Cal.Rptr.3d 682].)

## DISPOSITION

The petition is granted. Let a peremptory writ of mandate issue directing the trial court to vacate its order of May 21, 2008 ruling that Regulation 5 was a proper clarification of the LWO and enter a new and different order ruling that Regulation 5 is in conflict with the LWO and unenforceable in its entirety and to conduct any further proceedings not inconsistent with this opinion.

Petitioners are to recover their costs in this writ proceeding.

Woods, J., and Jackson, J., concurred.

A petition for a rehearing was denied February 19, 2009, and the opinion was modified to read as printed above.