[No. G041688. Fourth Dist., Div. Three. Aug. 31, 2010.]

GREAT WEST CONTRACTORS, INC., Plaintiff and Appellant, v. IRVINE UNIFIED SCHOOL DISTRICT, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

_____

* The Court of Appeal, in denying rehearing, issued a supplemental opinion on denial of rehearing that is not certified for publication.

**COUNSEL**

Pitre & Teunisse, Patricia A. Teunisse and Carole M. Pitre for Plaintiff and Appellant.

Bergman & Dacey, Gregory M. Bergman, John P. Dacey and Benjamin A. Shapiro for Defendant and Respondent.

**OPINION**

**SILLS, P. J.—**

## I. THE IMPORTANCE OF THIS CASE

This case is important for two reasons. First, it presents a challenging problem in public contracting law: How to distinguish a "nonresponsive" bid from a de facto determination that the bidder is not a "responsible" bidder. The difference is significant not only to the bidder, but to the taxpaying constituency of the public entity: A truly nonresponsive bid may be summarily denied by a public entity even if the bid is otherwise monetarily the best for the entity. On the other hand, a determination of nonresponsibility entitles the bidder to a hearing where certain minimal elements of due process must be afforded before the contract can be awarded to the next-best bidder.[1]

---

[1] Because of its relation to the public treasury and its bearing on the public interest, public contracting law has deservedly received considerable attention from the courts. Here is a bibliography, listed in chronological order and hence not necessarily in importance, of the California state court published decisions which have some bearing on the challenging question presented here: *West v. Oakland* (1916) 30 Cal.App. 556 [159 P. 202] (*West*); *Cyr v. White* (1947) 83 Cal.App.2d 22 [187 P.2d 834] (*Cyr*); *Raymond v. Fresno City Unified Sch. Dist.* (1954) 123 Cal.App.2d 626 [267 P.2d 69] (*Raymond*); *East Bay Garbage Co. v. Washington Township Sanitation Co.* (1959) 52 Cal.2d 708 [344 P.2d 289] (*East Bay Garbage*); *City of Inglewood-L.A. County Civic Center Auth. v. Superior Court* (1972) 7 Cal.3d 861 [103 Cal.Rptr. 689, 500 P.2d 601] (*City of Inglewood*); *Educational & Recreational Services, Inc. v. Pasadena Unified Sch. Dist.* (1977) 65 Cal.App.3d 775 [135 Cal.Rptr. 594] (*Educational & Recreational*); *Menefee v. County of Fresno* (1985) 163 Cal.App.3d 1175 [210 Cal.Rptr. 99] (*Menefee*); *R & A Vending Services, Inc. v. City of Los Angeles* (1985) 172 Cal.App.3d 1188 [218 Cal.Rptr. 667] (*R & A*); *Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331 [241 Cal.Rptr. 379] (*Taylor Bus*); *San Diego Service Authority for Freeway Emergencies v. Superior Court* (1988) 198 Cal.App.3d 1466 [244 Cal.Rptr. 440] (*San Diego Service Authority*); *Konica Business Machines U.S.A., Inc. v. Regents of University of California* (1988) 206 Cal.App.3d 449 [253 Cal.Rptr. 591] (*Konica*); *Boydston v. Napa Sanitation Dist.* (1990) 222 Cal.App.3d 1362 [272 Cal.Rptr. 458] (*Boydston*); *Pacific Bell v. California State & Consumer Services Agency* (1990) 225 Cal.App.3d 107 [275 Cal.Rptr. 62] (*Pacific Bell*); *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161 [36 Cal.Rptr.2d 521, 885 P.2d 934] (*Domar Electric I*); *Stacy & Witbeck, Inc. v. City and County of San Francisco* (1995) 36 Cal.App.4th 1074 [44 Cal.Rptr.2d 472] (*Stacy & Witbeck*); *Domar Electric, Inc. v. City of Los Angeles* (1995) 41 Cal.App.4th 810 [48 Cal.Rptr.2d 822] (*Domar Electric II*); *Valley Crest Landscape, Inc. v. City Council* (1996) 41 Cal.App.4th 1432 [49 Cal.Rptr.2d 184] (*Valley Crest*); *Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391 [52 Cal.Rptr.2d 395] (*Monterey Mechanical*); *Ghilotti Construction Co. v. City of Richmond* (1996) 45 Cal.App.4th 897 [53 Cal.Rptr.2d 389] (*Ghilotti*); *Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294 [53 Cal.Rptr.2d 355] (*Mike Moore's*); *United Systems of Arkansas, Inc. v. Stamison* (1998) 63 Cal.App.4th 1001 [74 Cal.Rptr.2d 407]; *MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359 [78 Cal.Rptr.2d 44] (*MCM*); *M & B Construction v. Yuba County Water Agency*

More particularly, this case illustrates the necessity of following the rule enunciated in 2007 by our Fifth District colleagues in *D.H. Williams, supra*, 146 Cal.App.4th 757 (*D.H. Williams*). Under the *D.H. Williams* rule, a public agency cannot reject the bid of the lowest bidder on a public works project on the theory that the *bid* is "nonresponsive" to the agency's request for bids when, *in substance*, the real reason for the rejection is that the agency thinks the lowest *bidder* is "not responsible"—at least not without giving the lowest bidder the chance for a hearing on whether the lowest bidder really is "not responsible." On the record before us, because *D.H. Williams* was not followed, the Irvine Unified School District appears to have paid $800,000 more than necessary to remodel two elementary schools.

The second major reason this case is important is that it presents an object lesson in how evidence that, at least on its face, tends to show favoritism—indeed, on this record, favoritism most foul—never got squarely presented to, or considered by, the trial court. The reason? An unfortunate combination of trial court calendaring beyond a petitioner's control, and a public entity's delay in complying with a request for information. (Readers can judge for themselves, when we recount the facts in detail in pt. II. below, whether "stonewalling" might not be a better word than "delay.")

Here, one competitor in a bid for a school remodeling contract, for some reason never adequately explained by the public entity, had access to the lowest bidder's bid information within *24 hours of the opening of all the bids*. Thus, this competitor was able to present a bid challenge almost immediately to the contracting school district based on the allegation that the lowest bidder had omitted to disclose some licenses with which it or its principals had been associated. And that competitor went on to be awarded one of two contracts up for award.

But when the lowest bidder tried to get a copy of that very same competitor's bid (as well as that of another company that was awarded the second contract), the school district did not turn over that information until several weeks later. More pointedly, the information was deliberately not made available until *after* the critical first court hearing in the case.

And then, when the lowest bidder finally did get the information on its competitors' bids, it allegedly discovered that its successful competitors had

(1999) 68 Cal.App.4th 1353 [81 Cal.Rptr.2d 231] (*M & B*); *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305 [96 Cal.Rptr.2d 747, 1 P.3d 63] (*Kajima*); *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241 [15 Cal.Rptr.3d 344] (*Marshall*); *D.H. Williams Construction, Inc. v. Clovis Unified School Dist.* (2007) 146 Cal.App.4th 757 [53 Cal.Rptr.3d 345] (*D.H. Williams*); *Blue Cross of California v. State Dept. of Health Care Services* (2007) 153 Cal.App.4th 322 [62 Cal.Rptr.3d 772]; and *Cypress Security, LLC v. City and County of San Francisco* (2010) 184 Cal.App.4th 1003 [109 Cal.Rptr.3d 107] (*Cypress Security*).

been guilty of the *very same omission with regard to the disclosure of all associated licenses that was the ostensible reason the lowest bidder's bid was summarily rejected in the first place.*

However, when, in the second hearing on the lowest bidder's main request for relief, the lowest bidder tried to proffer evidence that would show how it had been treated differently from the winning competitors, the school district vigorously objected on the ground that the evidence was submitted too late! It doesn't take Hamlet to figure out that something rotten happened in this case. In fact, it suspiciously fits George Washington Plunkitt's definition of "honest" graft—the use of tips to gain an advantage over one's rivals in public contracting.

Because this is a long opinion, we include an outline of it in the margin so that readers can see where the various pieces fit.[2]

[2] I. THE IMPORTANCE OF THIS CASE
II. THE HISTORY OF THIS CASE
   A. The Bid Call and Prequalification
   B. The Opening of the Bids and the Immediate Challenge to the Lowest Bidder's Bids
   C. The District Selects the Third-from-lowest Bidders
   D. A Disparity in Access to Information Quickly Emerges
   E. Great West Files a Writ Petition Without Receiving the Information It Requested from the District
   F. From the Filing of the Petition to the Initial Hearing
   G. The Crucial June 3 Hearing
   H. June 12 to July 3: Work Proceeds While Great West Awaits Its Second Hearing
   I. Great West Finally Receives Copies of Its Competitors' Bids
   J. The July 3 Second Hearing
   K. Aftermath of the July 3 Hearing: No Relief
   L. A New Hope for Great West: Amending the Petition
   M. The Request to Amend is Denied and this Appeal Ensues
   N. The Positions Taken by the District in Oral Argument at the Court of Appeal
III. DISCUSSION
   A. Mootness of the "Nonresponsive" Versus "Nonresponsibility" Issue
   B. The Merits of the "Nonresponsive" Versus "Nonresponsibility" Issue
       1. *The Importance of the Governing Legislative Text*
       2. *The Governing Statutes Here*
       3. *The Difference Between "Responsibility" and "Responsiveness"*
          a. The Nature of Responsibility
          b. The Nature of Responsiveness
             i. *responsiveness: the definition*
             ii. *responsiveness: the practice*
       4. D.H. Williams *Shows the Rejection Here Was for Nonresponsibility, Not Nonresponsiveness*
          a. The *D.H. Williams* Factors
          b. Application of the Relevant Factors
   C. The Proposed Amended Pleading
IV. DISPOSITION

## II. THE HISTORY OF THIS CASE

### A. The Bid Call and Prequalification

In late March 2008, the Irvine Unified School District put out what is sometimes called a "bid call," asking for contractor bids on two elementary school modernization projects, Eastshore and Northwood.[3]

Before bids were submitted, however, there was something called a "prequalification" process. The process is set out in section 20111.5 of the Public Contract Code. Basically, subdivision (a) of the statute gives the governing board of a school district the discretion to require prospective bidders to "complete and submit" a "standardized questionnaire and financial statement," including "a complete statement of the prospective bidder's financial ability and experience in performing public works." Subdivision (b) of the statute requires such districts to "adopt and apply a uniform system of rating bidders on the basis of the completed questionnaires and financial statements, in order to determine the size of the contracts upon which each bidder shall be deemed qualified to bid."

Plaintiff Great West went through the prequalification process for the Eastshore and Northwood projects. On May 1, the District sent Great West a letter saying Great West was indeed qualified to bid on the two projects.

### B. The Opening of the Bids and the Immediate Challenge to the Lowest Bidder's Bids

Upon the opening of the bids on May 8, it was revealed that Great West was the lowest bidder on both projects. On Eastshore, JRH Construction, the eventual winner, was the third-from-lowest bidder. On Northwood, Construct 1, the eventual winner, was the third-from-lowest bidder. The difference between Great West's bid and JRH's on the Eastshore project was about $500,000. The difference between Great West's bid and Construct 1's bid on the Northwood project was about $300,000.[4]

Great West had given as its license number 673901. But an item in the required bid package had asked: "Have you ever been licensed under a different name or license number?" In the question, there was a footnote after

---

[3] Some of the public entities in the cases include school districts (e.g., *Marshall, supra*, 119 Cal.App.4th 1241). When we say "District" with a capital "D" in this opinion, we mean the Irvine Unified School District. Small "d" districts refer to the districts discussed in the cases or to school districts generically.

[4] According to the petition Great West would soon file, it bid $2,993,300 on the Northwood project, and $3,072,000 on the Eastshore project. According to the board agenda summary of

the word "you" which defined "you" to include a contractor's "owners, officers, directors, shareholders, principals, responsible managing officer (RMO) or responsible managing employee (RME)." Great West had simply answered, "no." That "no" answer would soon become the ostensible reason the company would not get the contract.

On May 9, the day after the bids were opened, the vice president of Construct 1 (the eventual winner of the Northwood contract) sent the District a letter challenging the bids of Great West and the second-to-lowest bidder as well. The Construct 1 letter made two points: The letter argued that the two lower bidders had relied on an unreliable subcontractor for certain vapor emission treatment (a point that has no further relevancy to this case) and, more importantly, that Great West had "failed to disclose that they had previously operated under license #674120 and are also currently operating under license number #756099." The letter also asserted that Great West's president, Gary Wolfinger, "was also listed as the RME under license #376709." (Readers should remember the May 9 date of Construct 1's letter—it will resurface as significant 18 paragraphs from now.)

The letter apparently prompted a staff review of Great West's bid, which resulted in a letter from the District's director of construction and facilities to Wolfinger of Great West on May 16, 2008. The staff letter made these points:

(1) The Contractors' State License Board Web site listed Great West and Wolfinger as a joint venture under license No. 756099 (referenced in the Construct 1 letter above).

(2) Also, the board's "records" indicated that Wolfinger had been the responsible managing employee of another company (RJW Construction) "albeit for a short period of time in 1993, under license number 376709" (also referenced in the Construct 1 letter above).

(3) Great West was "an apparent joint venture partner under the business name of Trans-Pacific Constructors" under license No. 674120.

The bottom line of the letter (literally) was that District staff were recommending the District's board "reject your bid as non-responsive."

the meeting in which the contracts would ultimately be awarded, Construct 1 One Corp. (called "Construct 1" throughout this opinion), the winning bidder on the Northwood project, bid $3,316,973, while JRH Construction, the winning bidder on the Eastshore project, bid $3,558,000.

The exact differences between the winning bids and what lowest bidder Great West bid were $323,673 on Northwood, $486,000 on Eastshore. The total that the District paid for its decision to summarily reject Great West's bid was $809,673.

As Great West's opening brief now points out, the staff letter did not invite any response or suggest any opportunity for refutation or denial of its allegations. In any event, the board was due to award the contracts in only four days. The board agenda for the May 20 meeting did not give the amounts bid by Great West and the second-to-lowest bidders. Rather, it merely inserted the word "Non-Responsive" where the monetary amount of the bid would otherwise have been listed.

Great West did manage to submit two letters in response, however, both dated May 20, the date of the board meeting. One letter was from Wolfinger, Great West's president. The other was from its counsel. (The same counsel represents Great West in this appeal.) Wolfinger's letter made these points:

(1) Great West only operates and functions as a business under license No. 673901 (the one listed in the bid).

(2) Great West had in effect been sandbagged by the District on the "other license" question because it had submitted a prequalification package back in April which had a similar question and in which Great West gave the same answer, and that package was approved.

(3) The joint venture license number, No. 756099, was a license to perform general engineering work (basically, street utilities) and that "license had never contracted or functioned as a business."

(4) Wolfinger had merely been the "qualifier" for the RJW firm for 15 days while the RJW firm closed down and Great West started up.

(5) The Great West and Trans-Pacific joint venture "did not perform any work or function as a business." The license was merely obtained to increase Great West's available bond line.

For its part, Great West's counsel's letter made a legal argument that Great West's bid was *not* " 'non-responsive.' " Rather, the letter's thesis was that the "essence" of the District staff's proffered rejection of Great West's bid "goes to the question of Great West's responsibility." In that regard, the letter cited *City of Inglewood, supra,* 7 Cal.3d 861, and quoted the language from page 871 of that decision about the lowest bidder's right to a hearing when a bid is rejected for nonresponsibility.

Counsel's letter also repeated Wolfinger's points that no "business" was done under the other licenses. And it further asserted that (a) the time for such matters was during the prequalification process already held, and

(b) even if there were any *mistakes* in Great West's answer, they certainly were not material because they gave no "indication of 'untrustworthiness' on Great West's part."

### C. The District Selects the Third-from-lowest Bidders

The staff reports to the board on the two projects did not list the amount bid by Great West or the runner-up for either the Northwood or Eastshore project. The written agenda showed a list of all bidders on the two projects, with the amounts bid by the top two bidders not given, replaced by the words "Non-Responsive." Thus the very first bidders listed with numbers were Construct 1's $3,316,973 bid on Northwood and JRH's bid of $3,558,000 on Eastshore.

Counsel for Great West spoke at the May 20 board meeting, apparently airing, as the meeting's minutes later expressed it, "concerns . . . relative to the bid process." Two members of the five-member board, Mike Parham and Sharon Wallin, both suggested delaying the decision "pending clarification from legal counsel." Staff, however, "reiterated that legal counsel had already validated the district's position and a delay could jeopardize summer completion due to extremely tight timelines," and it appears the board agreed with their view.

And so, on May 20, 2008, the District's board awarded the Eastshore contract to JRH Construction, based on its bid of about $3.6 million, as opposed to Great West's bid of not quite $3.1 million. It awarded the Northwood contract to Construct 1 based on its bid of about $3.3 million, as opposed to Great West's bid of slightly less than $3 million.

### D. A Disparity in Access to Information Quickly Emerges

Great West quickly made the decision to contest the two awards in the court, and went into a fact-gathering mode. And that requires us to return, in our narrative, to Construct 1's May 9 letter.

For some reason, never explained in the District's briefing, Construct 1 got a copy of Great West's bid (as well as the second-to-lowest bidder's bid) within 24 hours of the opening of the bids. (The Construct 1 letter opened with the lines, "We have reviewed the bid packages from both the apparent low bidder and the apparent 2nd place bidder and found [and thereafter detailed the challenge to the vapor emission subcontractor].")

But Great West was not so favored. On May 21, the day after it lost the two contracts, Great West sent a written request to the District to inspect and copy the bid documents submitted by the two winners, JRH and Construct 1.

The next day, May 22, Great West's counsel followed up with the District's counsel. According to the later declaration of Great West's counsel, the District's counsel said he "would need to 'check' to see if [Great West] could even inspect the documents prior to the passage of ten days under the California Public Records Act." The matter was left, on May 22, with the thought that the District's counsel would " 'get back' " to Great West's counsel.

### E. Great West Files a Writ Petition Without Receiving the Information It Requested from the District

And the next day after that, May 23, Great West filed this case, generally arguing that Great West should have received the awards given to Construct 1 and JRH. But the precise relief requested is worth detailing now.

Great West did not ask for any sort of money damages for having been unlawfully denied the two contracts. Nor did it, for example, ask for a rescission or revocation of the awarded projects *pending* a substantive responsibility hearing under *City of Inglewood.*

Rather, its first two requests for relief were for alternative writs pursuant to section 1087 of the Code of Civil Procedure.[5] Each of those requests was for a writ that would *either* command the district to "immediately rescind its unlawful award" of the Northwood and Eastshore projects *or* "alternatively show cause why it has not done so at the time and date specified by this court." The next prayer was a straight-out request for relief, but was itself framed as an *alternative* to the alternative writs requested in the first two prayers. ("Alternatively, that this Court issue a peremptory writ of mandamus setting aside the award of the Northwood Project and the Eastshore Project and commanding [the District] to award both projects to [Great West].") The final

---

[5] A quick primer on writ structure in this context:

A trial court's power to issue a command to a school board to compel the performance of an act is found in Code of Civil Procedure section 1085, subdivision (a), which provides:

"(a) A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by such inferior tribunal, corporation, board, or person."

Section 1087 provides for two different *kinds* of such writs. Section 1087 of the Code of Civil Procedure provides in its entirety as follows:

"The writ may be either alternative or peremptory. The alternative writ must command the party to whom it is directed immediately after the receipt of the writ, or at some other specified time, to do the act required to be performed, or to show cause before the court at a time and place then or thereafter specified by court order why he has not done so. The peremptory writ must be in a similar form, except that the words requiring the party to show cause why he has not done as commanded must be omitted."

two prayers for relief were boilerplate: costs of proceedings and the standard "further relief" as the court might see proper.[6]

### F. From the Filing of the Petition to the Initial Hearing

Great West's petition was filed May 23. The District's contract with JRH was signed four days later, on May 27. The contract with Construct 1 was signed two days after that, on May 29.[7] The District issued formal notices to proceed to both companies on May 28. Each notice said "time is of the essence," and the "official start date of the project is therefore established as June 3, 2008."

On Monday morning, June 2, Great West applied ex parte for a temporary restraining order pending a full hearing on its petition for a writ of mandate. A hearing was set for the next day, June 3.

It was also on June 2 that the District sent letters to Great West on its requests for copies of the winning bids by JRH and Construct 1. In those letters, the District (to quote a document subsequently filed with the court by the District itself) told Great West that the District "agreed to make all of the requested documents available to [Great West] on June 4, 2008."[8]

There is no explanation in the District's briefing why the District waited until June 2 to "get back" to Great West on its records request, or why *June 4* was selected as the first available date Great West would be able to see copies of the winning bids.

But in any event, June 4 was convenient for the District. The hearing on Great West's request for temporary relief took place on June 3.

### G. The Crucial June 3 Hearing

It was at the ex parte hearing on June 3 that, in retrospect, seems where Great West's battle to actually be awarded the two contracts was, from a

---

[6] An interesting point here: Each prayer had a paragraph number, with the first three prayers numbered 1, 2, and 3. But the last two were numbered 6 and 7. That suggests—and remember that counsel put the petition together in a phenomenal three days—that in some late-night editing blur, Great West's counsel had two prayers for relief that ultimately ended up on the cutting room floor.

[7] May be May 27. The copy in our record looks like a sevenish "9" or a nineish "7."

[8] The document was the District's opposition to a motion Great West would make to amend its petition, filed November 24, 2008. To quote that opposition verbatim: "On June 2, 2008 the District sent letters to Petitioner in which it agreed to make all of the requested documents available to Petitioner on June 4, 2008." The motion to amend the petition that would be filed many months later in November is getting a bit ahead of ourselves at this point in our narrative. We deal with it in more detail in part II.L. anon.

practical point of view, lost. And that's ironic, because the result of that hearing was Great West's getting what its petition asked for—an alternative writ telling the District to give Great West the contracts or show up in court to explain why not.

A recount of some of the main points of the June 3 ex parte hearing is in order. The trial judge, Frederick P. Horn, opined that he thought the case would come "down to money damages." In fact, he didn't "see the emergency at this point." But he invited Great West's counsel to make her case for a writ. One of her arguments was that the District had been unusually late itself in setting the job for a bid. Usually, she argued, such "jobs need long lead times," so "they're not in May." Counsel for Great West further asserted that the District staff had a "hurry up and do it now" mindset about the two projects, noting that at the meeting two board members wanted a little bit of time to "consider" the matter. And she also alluded to the fact that right after Great West had filed its petition on May 23, staff "immediately went out and tried to get contracts signed." Counsel's basic point, though, was that since actual construction was not designated to start until June 23, there was still time for a "full hearing" to consider the matter and award Great West the contracts.

A declaration in the District's opposition papers had made the point that any delay in the two projects could cost the District considerable money. The District's theory was that if the two projects were not ready by the beginning of the school year, the District would be forced to use temporary classrooms or "other facilities." The District's director of construction and facilities in fact opined the cost of "delay or variation from the present schedule" could be as much as half a million to a million dollars. Not surprisingly then, at the ex parte hearing, counsel for the District saw the case as one where a writ was not appropriate, and Great West's relief was monetary only, if that.

The June 3 hearing ended with Judge Horn saying, "I'll try to get a ruling out on this by the end of the day." Judge Horn, however, was in the middle of a jury trial, so his decision was not filed until June 12. When it was filed, he used the proposed form order submitted by Great West back when it first filed the petition on May 23 (thus the document has a "received . . . May 23, 2008" stamp as well as a "filed . . . June 12" stamp). We quote the order in its entirety, including Judge Horn's interlineations, in the margin.[9] Essentially, it

[9] "To the Board of Education of the Irvine Unified School District:

"You are hereby ordered . . . immediately after receipt of this writ to rescind your May 21, 2008 award of the contract for the Northwood Elementary School Modernization and Eastshore Elementary School projects to Construct 1 and JRH, respectively and are hereby ordered to award both projects to Great West Contractors, Inc. forthwith *or* to appear before this court on 6-30, 2008 at 1:30 pm in Department C31 of this court, to Show Cause, if any

told the District to either (1) rescind the award of the contracts made a few weeks earlier in May to the not-lowest bidders and award them to the lowest bidder, Great West, or (2) show up in court on June 30, 2008, to explain why not.

According to the proofs of service in our record, the order was personally served on an attorney with the law firm representing the District at 12:40 p.m. on June 13. It was also served on the secretary to the District board, with copies left for each of the five board members, at 3:35 p.m. on June 12.

### H.   June 12 to July 3: Work Proceeds While Great West Awaits Its Second Hearing

Despite the alternative writ served on the District, work continued. After June 12, the District carried on as if there was no possibility that the court might grant Great West's third prayer for a peremptory writ of mandamus requiring that the projects be, in effect, turned over to Great West.[10]

The District filed its opposition on June 23. The focus of the opposition was the "due diligence" of the staff in checking with the Contractors' State License Board that revealed that "Great West and its principals had been issued different contractor license numbers in the past, none of which were identified in its answer to the bid questionnaire," hence Great West's bid was correctly deemed "nonresponsive." Moreover, the District argued that the writ relief requested was moot on the theory that when the District awarded the contracts a month earlier on May 21, that award was a done deal.

### I.   Great West Finally Receives Copies of Its Competitors' Bids

Something else happened in the runup to the June 30 hearing: About June 10, Great West finally received copies of the ultimate winning bids of Construct 1 and JRH. And, at least according to Great West's review of those bids, Construct 1 and JRH had *themselves* been guilty of omitting other licenses with which they had been associated. The apparent favoritism shown Construct 1 and JRH became the subject of Great West's reply brief.

---

you have, why this writ should not issue. Petitioner to serve by 5:00 pm 6-13-08. Written opposition shall be due on or before 6-23, 2008, by 5:00 pm. Any reply thereto shall be due by 5:00 pm 6-25, 2008. Opposition and reply must be served in a manner to ensure delivery on the date due." (Italics added.) Quotations of words appearing in all capitals are quoted in normal capitalization throughout this opinion.

[10] A similar thing happened in *D.H. Williams*, where the plaintiff bidder actually *prevailed* at trial, got a judgment requiring it be awarded the contract, the judgment was appealed by the defendant school district and thus judgment was stayed, and during the pendency of the appeal the work was completed.

## J. The July 3 Second Hearing

The hearing scheduled for June 30 did not take place until July 3. And it involved a new judge, Sheila Fell, instead of Frederick Horn. In making her presentation, counsel for Great West raised the issue of the apparent discrepancy in treatment afforded Construct 1 and JRH, and asserted the "logical inference is that there is either favoritism or corruption that is going on . . . ." The District counsel (the same attorney who had been served with the June 12 writ) argued that any "favoritism and corruption" was not technically "before" the court, and said Great West could, if it wanted, "bring a separate matter and raise all those issues."

The first part of the hearing centered on the reply brief material, with the court wondering if it might not be better to give the District some extra time to respond to the new material. Counsel for Great West argued that it was the District's own fault that the timing was so tight ("they created whatever exigency there is") and thus if the District were afforded any "additional time, it should be very short." In the end, the trial judge determined that she would not consider the "new material," though counsel for Great West argued that it really wasn't a new issue but the "other side of the coin" of the District's argument that it had discretion to consider Great West's supposedly false answer "non-responsive."

In the middle part of the hearing, counsel for the District argued Great West wanted to "punish the District for doing due diligence and looking at various web sites and discovering it was a falsity in the response because the answer is 'yes.' " When the court observed that "technically they were responsive, they answered the question," District counsel argued that not answering the question "truthfully" made it nonresponsive. The judge then asked, "Well, but are they not entitled to a hearing thereafter?" And counsel for the District said no—not when there is a "determination of nonresponsiveness."

The dialog between the trial judge and counsel for the District then turned to the state of the work. Counsel for the District allowed that the winning contractors were already "a quarter of the way or a little bit more" done. The balance of the hearing focused on the responsibility-responsiveness dichotomy, with counsel for Great West asserting that the other-license question was a way "to get rid of bidders that you don't like."

The hearing ended with the trial judge taking the matter under submission, but declaring that, in any event, (1) she wouldn't consider the new material and thus (2) was "not going to find corruption or favoritism."

### K.    Aftermath of the July 3 Hearing: No Relief

Twelve days went by, which itself was an obvious message that Great West was not going to have the projects awarded to it. Then, in a minute order dated July 15, the court held: (1) Great West's bid was nonresponsive and (2) even if Great West had a due process right to a hearing (as would be the case if the rejection were really based on its purported nonresponsibility), all it could get by way of relief would be a *hearing*, and any relief that such a hearing might afford would not "correspond to the injury alleged," i.e., denial of the contract. The request for a peremptory writ of mandamus was thus denied. We quote the relevant portions of the minute order in the margin.[11]

The July 15 minute order also did this: It sustained objections to the declaration of Great West's lawyer filed in support of its reply. The sustaining of those objections is noteworthy because it was in the declaration supporting the reply that the whole story finally came out about the District's—let's use a neutral word for the moment—"delay" in affording Great West copies of its rivals' bids. On the other hand, the trial court *granted* Great West's request for judicial notice of computer printouts from the Contractors' State License Board which purported to support its claim that JRH and Construct 1 had themselves failed to list every name or license otherwise required in the bid request.

### L.    A New Hope for Great West: Amending the Petition

August passed without a formal judgment being entered against Great West. On September 18, though, there was a case management conference. And by that date in September, Great West's counsel had come up with the idea of amending the writ petition to allege a cause of action for damages based on the lack of a hearing, combined with the apparent favoritism shown the winning bidders, whose bid packages were (allegedly) just as deficient as Great West's.

---

[11] "Irvine Unified School District [sometimes hereafter referred to as 'District'] prepared its Bid Package to obtain relevant and material information from interested applicants. The District was and is not limited as to what information it can request. After receipt and review of the applications, the District determined that the response provided by Great West Contractors, Inc. [sometimes hereafter referred to as Great West] to Question 5 was incomplete and inaccurate. This rendered the bid non-responsive.

"Based on this, the Court finds that the District had sufficient cause to deem the bid of Great West to be non-responsive and to reject it.

"Even if the Court were to find that Great West had a due process right to a hearing, the remedy would merely be to issue a writ of mandate to the District compelling a hearing. The award of the construction contract to Great West would not have been the appropriate remedy in this case. Therefore, the relief sought does not correspond to the injury alleged. Great West would, at best, be entitled to a hearing."

Nothing began to happen until early October. On October 2, the District submitted a proposed judgment. Eight days later, on October 10, Great West objected to the proposed judgment, asking for a postponement until it could have a motion for leave to amend to add a claim for money damages heard. By this time school had opened, the work had presumably been completed, and Great West explicitly conceded that the relief it had requested back in May was moot.

Also on October 10, Great West submitted a formal claim for money damages to the District in anticipation of obtaining leave to assert a money damages claim in civil court. (Obviously Great West was under no illusions that somehow the District might approve its claim.) And five days later, on October 15, Great West filed its anticipated motion.

Not surprisingly, the opposition to the motion argued various permutations of the idea that Great West had simply waited too long to make the request. But there was an interesting substantive argument too. Great West had let on that it was planning to appeal from the eventual judgment that would embody the July 15 denial of request for a peremptory writ, which prompted the District to argue that allowing a proposed amendment "before pursuing an appeal" would "cause potential confusion and deception which will likely prejudice the District on appeal." The danger, said the District, was that: "The Court of Appeal may be confused as to the effect of the amendment where the record, and this Court's ruling on the Petition, reveals that no action had been taken on Petitioner's proposed alternative relief for damages."[12] This danger could require, at a "minimum," the District to "take extra measures to explain the logic—or lack thereof—for the amendment and place an additional burden on the District to ensure that the court of appeal does not take the amendment into consideration in deciding the appeal."

Rather, the District had a "better alternative." It elaborated: "As was suggested by the District at the September 18, 2008 case management conference, [Great West] should wait until after an appeal to seek leave to amend. By deferring until after an appeal, the parties need not concern themselves with the amendment on appeal; there will be no opportunity for the confusion or deception described above."

---

[12] No. It wouldn't have confused us in the slightest. Had an amendment been allowed and no action was otherwise taken to adjudicate it, any purported appeal would have been dismissed for lack of a final judgment. (See *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743 [29 Cal.Rptr.2d 804, 872 P.2d 143] ["Accordingly, we hold that an appeal cannot be taken from a judgment that fails to complete the disposition of all the causes of action between the parties even if the causes of action disposed of by the judgment have been ordered to be tried separately, or may be characterized as 'separate and independent' from those remaining."].)

Almost two months later, on December 10, 2008, the motion for leave to amend was heard. The most significant point of the oral argument was Great West's counsel's plea that, no matter how the court ruled on the request to amend, the court enter its order on the motion to amend prior to the filing of any judgment. (Obviously counsel did not realize that if the motion to amend were *granted*, there could be no appeal because there would have been a cause of action remaining for disposition. (See *Morehart v. County of Santa Barbara, supra*, 7 Cal.4th at p. 743.))

### M. The Request to Amend is Denied and this Appeal Ensues

In a minute order issued one week later on December 19, Great West's counsel was granted her wish that the order on the motion to amend precede the judgment. Even so, the request to amend was denied.

The substantive part of the minute order said: "There was no authority cited in the motion which allows an amendment of a Petition after the trial court has already adjudicated and ruled on the Petition's merits. The Petitioner's request is not proper—it already had the opportunity to amend the Petition prior to the hearing on its merits."

The judgment was filed on December 24, 2008, formally denying the petition for peremptory writ and discharging the alternative writ. Given service of notice of entry of judgment on December 31, 2008, the February 26, 2009 notice of appeal from the judgment and "all orders encompassed therein" was timely.

### N. The Positions Taken by the District in Oral Argument at the Court of Appeal

Not surprisingly, at oral argument in this court, the question of the disparity in information access came up. Counsel for the District said, "I don't know" to the question of why a competitor of Great West's had access to Great West's bid within 24 hours when Great West had to wait weeks for the same information regarding its competitors.[13] He was definitive, however, in saying that upon the bids being opened, the information *immediately* became public. He was not asked how that position squared with the position taken by a District counsel on May 22 to the effect that the District's counsel "would need to 'check' to see if [Great West] could even inspect the documents prior

---

[13] To be fair to the District's counsel, the question was posed as to why JRH had the early access when, upon review of the record, we learned that it was Construct 1 who had that access.

to the passage of ten days under the California Public Records Act." (Judging by what District counsel said at oral argument in this court, copies of the rival bids should have been at least accessible to Great West's counsel from May 9.)

Counsel for the District was also confronted with the alleged disparity of treatment in that the two winning bidders were guilty of the same problem with associated licenses that got Great West's held nonresponsive. His answer was that the "due diligence" of District staff entailed checking *all* bidders prior to the bids being considered by the board. The implication is that, if the matter were actually litigated, the District might be able to refute the merits of Great West's disparate treatment claim concerning the "other licenses" issue.

The answer at oral argument is as close as the District has come to confronting the merits of the issue of disparate treatment vis-à-vis the "other licenses" question. That answer, we will note here (and as also stated by Great West's counsel at oral argument in this court), is at odds with the argument in the respondent's brief. There, the District has argued that: "It is clear, however, that the excluded evidence, on its own, would have been insufficient to demonstrate that the District was arbitrary or capricious, as it would not have shown there were any deviations, much less that the District *knew* of them at the time the awards were made" (original italics). The emphasis on the word *knew* in the District's brief suggests that the District did not check out *all* bidders prior to awarding the contracts. (Otherwise, the District would have presumably been *aware* of the alleged "deviations" in the winners' bids.)[14]

For its part, Great West has asserted (in its opening brief) that something fishy was going on, because it was actually *easier*, by looking at the state licensing board Web site, to determine that the two rival winning bidders had "other licenses" than it would have been to determine that for Great West. The implication is that the District staff *didn't* examine the winners' bids for the same "associated license" discrepancies to which it subjected Great West.[15]

---

[14] Presumably, if the discrepancy were some figment of Great West's counsel's imagination, the District would have been eager to demonstrate it and lay the issue to rest.

[15] Because Great West was never afforded a hearing, the conflict in the factual assertions— did the District *know* that the winning bidders, like Great West, had also not listed all associated licenses?—remains as yet unlitigated at any level.

## III.  DISCUSSION

### A.  Mootness of the "Nonresponsive" Versus "Nonresponsibility" Issue

By mid-October 2008, even Great West had to concede its quest for a writ requiring the District to give it the two school contracts had become moot. The modernization work was done. The District says that therefore this court should not decide the propriety of the District's rejection of Great West's low bid on the ground that the bid was nonresponsive.

The nonresponsive versus nonresponsible issue is, however, a classic example of an issue capable of repetition yet likely to evade review. Consider: In public contracts of a short lead-time nature, like the ones here, an initial determination by the public agency that the lowest bid is "nonresponsive" allows for a summary rejection of that bid that may readily preclude effective judicial redress.

Within a month, a little month, this case was effectively over as far as any practical possibility that the lowest bidder might actually obtain the contract was concerned. Great West filed its writ petition within three days of the May 20 award. While it probably should have sought to have a hearing on its temporary restraining order immediately, it did manage to arrange for such a hearing on June 4. But even then, there was no decision on its request until June 12 (which, we stress, that *wasn't* the trial judge's fault, a fact which only underscores how hard it was for Great West to obtain any relief in the ordinary course of things), and the ensuing order set a hearing date so late into the construction process that it effectively mooted the requested relief.[16]

The Irvine Unified School District, anticipating the capable-of-repetition-yet-evading-review doctrine, basically asserts (to quote its respondent's brief

---

[16] In this regard, we note another practical factor that shows just how ephemeral is the opportunity to present to an appellate court the issue of the validity of a determination of nonresponsiveness—the relative incentive structure bearing on what an aggrieved contractor can obtain by way of relief.

It is established law that a contractor wrongfully denied a public contract by a public entity can recover bid preparation costs but not lost profits. (*Kajima, supra*, 23 Cal.4th at p. 308 ["We conclude bid preparation costs but not lost profits are available under a theory of promissory estoppel."].) As Great West's counsel pointed out in oral argument before this court, the rule has this effect: The main incentive for a bidder who has been wrongfully denied a public contract is to bring litigation that seeks to have the public contract ultimately awarded to it. And since such litigation is necessarily a prolonged process, which can entail a victory consisting of an order for a new request for bids and rebidding (as happened in *Konica, supra*, 206 Cal.App.3d 449 [where university had no discretion to excuse large deviation by winning bidder, university was required to publish new request for bids within 30 days of remittitur]), even more time will pass during which the relief request can be mooted.

directly) "the narrow scope of interest is unlikely to reoccur," in part because Great West has not "allege[d] a systematic practice of repeatedly harming the public fisc, only an improper determination regarding the bids of a single contractor, Appellant."

There are three underlying ideas inherent in the District's formulation. Each is worth examining individually.

■ The first is that this case, involving as it does the question of the difference between a nonresponsive and a nonresponsible bidder, does not implicate an issue of the public interest. But it obviously does. As the *D.H. Williams* court stated: "School districts, like most other public agencies, are required by law to award construction contracts (with certain narrow exceptions) to the 'lowest responsible bidder.'" (*D.H. Williams, supra,* 146 Cal.App.4th at p. 763, citing Pub. Contract Code, § 20111.) Assuming that Great West is correct that its bid was not "nonresponsive," then this case represents an example of how the statutory mandate that public contracts be awarded to the lowest responsible bidder could be readily circumvented: The agency simply deems some aspect of the winning bidder's bid package to be "nonresponsive" in order to award the contract to the next (and perhaps favored) bidder.

The second idea inherent in the District's argument is that the fact pattern exemplified in this case is "unlikely" to reoccur. Au contraire again. While the details might differ, the basic pattern is pretty simple: By deeming something in a bid package to be "nonresponsive," a public agency can circumvent public contracting statutes and do so without affording that bidder a hearing.

The third idea is that Great West did not allege any "systematic" practice of harming the public fisc. There is rich irony in the District's assertion. Besides which, it is plain wrong.

This record readily gives rise to a reasonable inference of a "systematic" practice of favoritism and "harming the public fisc." For favoritism: The District gave one bidder access to its rivals' bids immediately, but hemmed and hawed before giving the lowest bidder similar access to its rivals' bids, then used the delay to prevent the trial court from having to consider that maybe those rivals were guilty of the same offense that ostensibly prompted the rejection of the lowest bidder's bid.[17] For harming the public fisc: The sweaty haste with which the District consummated the contracts with the third-from-lowest bidders, contrasted with the insouciance and delay with which it

[17] (See, e.g., Greenwood, *Looting: The Puzzle of Private Equity* (Fall 2008) 3 Brook. J. Corp. Fin. & Com. L. 89, 92 ["Boss Tweed's associate George Washington Plunkitt contended

honored the lowest bidder's request for records, are all susceptible, of course, of at least an inference that the fix was in from the beginning not to award the contracts to Great West.

Finally, no less than three cases are on point, all of which establish the need to address the merits of the responsive-responsibility issue here: *D.H. Williams, M & B*, and *Marshall*. (In each case, the work was completed by the time the appellate court was able to consider the appeal.) The District simply ignores the first and fails to persuasively distinguish the other two.[18]

Most importantly, the District downplays the major public concern presented by the events in *this* case. Let us spell it out: Assuming Great West's position is correct, then a public entity otherwise bound to award a contract to the lowest responsible bidder can, by the simple imperial ukase of declaring a specific answer to a question required on a bid form to be "nonresponsive," baldfacedly circumvent the public contracting law that requires the contract to be awarded to the lowest responsible bidder. Far from presenting a "narrow issue," the case presented here is one is of vital interest to all taxpayers.

---

that while this 'dishonest graft' is wrong, the Tweed machine limited its own activities to 'honest graft:' giving government work only to his supporters who provided just as good service as anyone else."].)

[18] As noted above, *D.H. Williams* was similarly moot because all construction had been completed by the time the appellate court could consider the case. (See *D.H. Williams, supra*, 146 Cal.App.4th at p. 763, fn. 2.)

*M & B* was a case where a public agency required, in its first invitation for bids, a "Class A" license for all bidders. The lowest bidder on the first invitation, however, lacked that class of license. Before the contract was awarded, the lowest bidder sued and obtained a writ of mandate which caused the agency to issue a second invitation for bids. However, the lowest bidder the first time was not the lowest bidder the second time, so the contract went to another company anyway. The case was thus moot. Even so, the *M & B* court readily agreed that the propriety of the writ of mandate "involves a matter of public interest which is likely to recur." (*M & B, supra*, 68 Cal.App.4th at p. 1358.)

The District attempts to distinguish *M & B* by saying, "A public entity's right to set the overall qualifications for the contractors it desires for a given project also contrasts sharply with [this case], which again merely pertains to a contractor omitting responsive information in its bid package." No. The District's argument is circular: It asks us to assume its position on the merits is correct, namely that Great West's bid was in substance nonresponsive. But that's the issue in the case to be decided, not a premise on which to distinguish *M & B*.

Similarly, there is *Marshall*. In *Marshall*, a school district tried to award a project to a particular contractor without competitive bidding on the theory that there was an "emergency." A trial court disagreed, and ordered the contract rescinded and the case rebid. As events played out, though, the bidder who brought the litigation lost out in the rebidding. Even so, the *Marshall* court had no qualms about noting that the merits of the case should be considered because it clearly affected the public interest. (*Marshall, supra*, 119 Cal.App.4th at p. 1250.)

The District here attempts to distinguish *Marshall* as it did *M & B* by again arguing there is a sharp contrast in the two cases. Asserts the District: The "broad interest in Marshall contrasts sharply with the narrow issue presented here: the District's determination that Appellant failed to provide responsive answers in its bids." No. This case presents an issue of major public importance.

### B. The Merits of the "Nonresponsive" Versus "Nonresponsibility" Issue

#### 1. *The Importance of the Governing Legislative Text*

For a topic on which there are so many published opinions, the case law bearing on public contract bidding is remarkably consistent. We have found only two cases which might be in even putative tension with each other, and upon examination, they are not even that.[19]

The key to understanding the remarkable consistency in the cases is this: The amount of leeway a public entity has in awarding a contract is governed by the statutory or municipal law framework applying to that contract. (E.g., *East Bay Garbage, supra*, 52 Cal.2d 708 [because state statutes requiring award to lowest responsible bidder applied, contract awarded to second-lowest bidder was void]; *Monterey Mechanical, supra*, 44 Cal.App.4th 1391 [governing statute set forth exclusive criteria entity could require in bid to satisfy affirmative action goal, ergo sanitation district had no discretionary authority to reject lowest bidder's bid on ground that bid was not responsive to additional criteria added by district]; *Pacific Bell, supra*, 225 Cal.App.3d 107 [because statute specifically gave state agency discretion in procurement of data processing and telecommunications contracts, agency had discretion to categorically exclude bids that provided for leasing, as distinct from sale, of equipment]; *San Diego Service Authority, supra*, 198 Cal.App.3d 1466 [governing statute for award of contracts for freeway emergency call boxes did not require competitive bidding at all]; *R & A, supra*, 172 Cal.App.3d at p. 1193 [because city charter and not state statutes

---

[19] The two cases are *Valley Crest, supra*, 41 Cal.App.4th 1432 and *Ghilotti, supra*, 45 Cal.App.4th 897, both decided in 1996. Both were cases where the public entity only wanted bids that provided that the bidder would itself do at least 50 percent of the work, as distinct from subcontracting it out. In *Valley Crest*, the lowest bidder submitted a bid that called for 83 percent subcontracting—pretty hard to ignore—and the appellate court ultimately held that the entity did *not* have the discretion to excuse the discrepancy from the bid request. (Technically, the entity fudged the process a bit by allowing the lowest bidder another chance to submit its bid, based on the fiction that the 83 percent was a "mistake." The appellate court was not fooled.) By contrast, in *Ghilotti*, the discrepancy was a mere 5.5 percent (the bid called for 55.5 percent subcontracted work), which was one of two points on which the *Ghilotti* court distinguished *Valley Crest*. (See *Ghilotti, supra*, 45 Cal.App.4th at p. 911.) (The other point was that rather ham-fisted attempt by the entity in *Valley Crest* to allow the winning bidder to correct its "mistake" by withdrawing its bid. (See *ibid.*)) There is a passage in *Ghilotti* that says: "We find *Valley Crest* distinguishable from this case. To the extent its reasoning is inconsistent with ours, we respectfully disagree." (*Ghilotti, supra*, 41 Cal.App.4th at p. 909.) However, since *Valley Crest* never questions the principle on which *Ghilotti* was decided, namely that public entities have discretion to discard *immaterial* deviations from bid requests, the "disagree" line was unnecessary. There was nothing in *Ghilotti* to disagree with *Valley Crest*.

governed award of contract for refreshment stands in city park, city had discretion to conclude that highest bid for right to sell in park was " 'unrealistic and contained admitted inaccuracies' "].)

To be sure, the idea of looking to the governing legislative scheme, whether it be found in state statutes or city charters, might seem pretty self-evident. But this simple idea explains both otherwise inconsistent *results* in the cases as well as differences in the judicial language used in the respective decisions.

■ Thus, where a statute requires a public entity to award a contract to the lowest responsible bidder, the courts have been vigilant in not excusing attempts by public entities to circumvent that requirement. (See, e.g., *City of Inglewood, supra,* 7 Cal.3d 861 [because statute required award to lowest responsible bidder, county had no authority to select a bidder that the city thought was "superior" where both bidders were still responsible]; *East Bay Garbage, supra,* 52 Cal.2d 708 [because lowest responsible bidder statute applied, city could not prefer second-to-lowest bidder]; *Marshall, supra,* 119 Cal.App.4th 1241 [school district had no authority to bypass competitive bidding required by governing statute under the guise of an "emergency" because the situation did not meet statutory criteria for an "emergency"]; *Boydston, supra,* 222 Cal.App.3d 1362 [prospective tenant on ranch owned by sanitation district who made best monetary bid for leasehold was entitled to hearing on his responsibility before district could award leasehold to bidder that district preferred].)

By contrast, where a statute or city charter specifically contemplated discretion on the part of the public entity to look at factors in addition to the monetary benefit of the bid, awards to other than the best monetary bidders have been upheld. (E.g., *Cypress Security, supra,* 184 Cal.App.4th 1003 [city could prefer bidder who contemplated union contract with employees of security services for city human resources department]; *Mike Moore's, supra,* 45 Cal.App.4th at p. 1307 [city ordinance gave city wide discretion to "waive defects and technicalities," and thus city could award towing contract to second-best monetary bidder where best monetary bidder did not give required biographical information on its employees]; *Taylor Bus, supra,* 195 Cal.App.3d 1331, 1335 [decided under statute for contracting of school bus services that "does not require the contract be let to the lowest bidder"]; *R & A, supra,* 172 Cal.App.3d at p. 1193 [city had discretion under city charter to reject best monetary bidder's bids for being unrealistic and containing " 'admitted inaccuracies' "].)

We may observe here that the difference in governing legal frameworks is itself the ultimate product of a legislative determination of a tradeoff between competing sets of values.

Cases where the governing statute requires the public entity to award a contract to the lowest responsible bidder even if it means bypassing a "superior" bidder emphasize the public interest in guarding against "Tammany-style" favoritism and corruption. (See *Domar Electric I, supra,* 9 Cal.4th at p. 173 ["Thus, charters requiring competitive bidding are not to be given such a construction as to defeat the object of insuring economy and excluding favoritism and corruption."]; *City of Inglewood, supra,* 7 Cal.3d at p. 866 ["To hold otherwise as a broad principle would open the door to possible favoritism, fraud or corruption in the letting of other public construction contracts."]; *Marshall, supra,* 119 Cal.App.4th at p. 1256 ["we note the ' " purpose of requiring governmental entities to open the contracts process to public bidding is to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition" ' "]; *Boydston, supra,* 222 Cal.App.3d at p. 1368 ["*East Bay Garbage Co.* reflects the public policy behind all statutory competitive bidding requirements governing the letting of public contracts: benefit to and protection of the public. . . . '[L]owest responsible bids' insure the greatest possible value for the least expenditure. . . . 'Highest responsible bids' secure the largest reasonable return to the public. . . . In either case the principle is the same—assurance that the taxpayers receive the most for their money and that awards are made without favoritism, fraud or corruption." (citations omitted)]; *Kajima, supra,* 23 Cal.4th at p. 314 [" ' "The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable . . ." ' "].)

On the other hand, at least some of the cases involving governing legislative schemes that allow for discretion in public contracting often emphasize just that—discretion. (E.g., *Mike Moore's, supra,* 45 Cal.App.4th at p. 1303 [the " 'letting of contracts by a governmental entity necessarily requires an exercise of discretion guided by considerations of the public welfare' "]; *Educational & Recreational, supra,* 65 Cal.App.3d at p. 782 ["We believe, by adding these words, the Legislature made it clear that the District had the right to use judgment and discretion in awarding the contract and was not bound by the lowest bidder provided it first determined that the prevailing bidder could supply the better service under the enunciated standard."]; see also *Cypress Security, supra,* 184 Cal.App.4th at pp. 1011–1018 [generally applying abuse of discretion standard].)[20]

---

[20] A corollary of the tradeoff between protecting the public fisc and affording agencies the discretion to pick the best bidder is the distinction in the case law between services and building contracts. Courts considering public contracts for services have recognized that services tend to be more individuated than construction and have accordingly allowed the public entity more room to accept something less than the best monetary bid, i.e., to use their

## 2. *The Governing Statutes Here*

There is no question that Public Contract Code section 20111 provides the applicable statutory framework in this case. The key language is in subdivision (b), which provides: "The governing board *shall let any contract for a public project*, as defined in subdivision (c) of Section 22002, involving an expenditure of fifteen thousand dollars ($15,000) or more, *to the lowest responsible bidder who* shall give security as the board requires, or else reject all bids." (Italics added.)[21]

This is thus *not* a case, like *Taylor Bus*, in which the court specifically noted the governing statute "does not require the contract be let to the lowest bidder." (*Taylor Bus, supra*, 195 Cal.App.3d at p. 1335.)[22] This case, like *East Bay Garbage*, *City of Inglewood*, *Boydston*, and most importantly, *D.H. Williams*, falls on the side where the Legislature has carefully circumscribed public entity discretion.

## 3. *The Difference Between "Responsibility" and "Responsiveness"*

### a. The Nature of Responsibility

The definition of responsibility is fairly easy, because it is now statutory, set forth in section 1103 of the Public Contract Code. We now quote in full:

own judgment in determining the best bid, not necessarily the most profitable. (E.g., *Cypress Security, supra*, 184 Cal.App.4th 1003 [contract was for security services at city human resources agency]; *Cyr, supra*, 83 Cal.App.2d 22 [exclusive contract for publication of city's public notices, hence circulation of competing newspapers was of more importance than nominal cost].) The point was made explicitly in *Educational & Recreational, supra*, 65 Cal.App.3d 775, a case which, like *Taylor Bus*, centered on a contract for school bus services: "*Service-type contracts are unique and are treated differently by the courts*. All bidders are vying to demonstrate that they can perform the busing contract at the lowest possible figure consistent with proper and satisfactory service." (*Educational & Recreational*, at p. 785, italics added.)

[21] Subdivision (c) of section 22002 provides:

"(c) 'Public project' means any of the following:

"(1) Construction, reconstruction, erection, alteration, renovation, improvement, demolition, and repair work involving any publicly owned, leased, or operated facility.

"(2) Painting or repainting of any publicly owned, leased, or operated facility.

"(3) In the case of a publicly owned utility system, "public project" shall include only the construction, erection, improvement, or repair of dams, reservoirs, powerplants, and electrical transmission lines of 230,000 volts and higher."

[22] The offbeat use of the word "let" for "award" is of course recognized by Black's Law Dictionary. (See Black's Law Dict. (9th ed. 2004) p. 986 [giving a third level definition of the verb "let" as "To award (a contract), esp. after bids have been submitted . . ."].) The Oxford English Dictionary indicates that the use of "let" to mean the temporary possession or use of land ("let" as an archaic synonym for rent out) has Anglo-Saxon origins predating the Norman Conquest. (See 8 Oxford English Dict. (2d ed. 1989) p. 845.)

" 'Responsible bidder,' as used in this part, means a bidder who has demonstrated the attribute of trustworthiness, as well as quality, fitness, capacity, and experience to satisfactorily perform the public works contract. [¶] The Legislature finds and declares that this section is declaratory of existing law."

■ Readers of Public Contract Code section 1103 will note that it is focused on the bid*der*, not the bid. The statute speaks in terms of personal qualities that have been "demonstrated" by the bidder. And the legislative emphasis on responsibility going to the personal quality of the bidder is all the more significant when one recognizes the history of the case law on responsible bidding.

The first California case to confront the nature of what it means to be the lowest *responsible* bidder was the 1916 case of *West, supra*, 30 Cal.App. 556, which, if you stand back and look at it today, essentially functioned as a *responsive* bidding case. For a contract to build a city jail, the lowest bidder proposed to use a locking device in a jail construction bid that was "unsatisfactory in both design and operation." The court held that the city had the authority to prefer the "offer" of the second-lowest bidder who proposed to use the much better "Stewart locking device." (*Id.* at pp. 558, 560–561.)

However, in the 1954 case of *Raymond, supra*, 123 Cal.App.2d 626, the clear emphasis was on qualities of the bidder, not the bid. There, a school district validly rejected the lowest bidder's bid for a school building as coming from a nonresponsible bidder because the lowest bidder had *already* built a building for the district, and that building had been the subject of "many complaints," including doors hung improperly and a leaky heating system. *Raymond*, in fact, may be the quintessential "responsibility" case, because the decision boiled down to the idea that the school district had good reason not to trust the lowest bidder to do even a halfway decent job. (See also *Stacy & Witbeck, supra*, 36 Cal.App.4th 1074 [city could validly declare contractor irresponsible in wake of dispute over change orders and city utilities commission finding that contractor knowingly and intentionally submitted a false claim].)

It was that emphasis on the personal qualities of the bidder that was finally picked up by our Supreme Court in the early 1970's in *City of Inglewood, supra*, 7 Cal.3d 861 and embedded into California common law. *City of Inglewood* was the genesis of today's statutory language: the words "trustworthiness," "quality," "fitness" and "capacity" are original, in the responsible bidder context, to that case. (See *id.* at p. 867.)

In *City of Inglewood*, the high court squarely confronted the original *West* paradigm of a responsibility being defined in terms of an "offer." And

changed it. The court began by squarely rejecting the concept of "relative superiority" in the context of a statute requiring acceptance of the bid of the lowest responsible bidder. Then, in a footnote, it shifted the emphasis of the *West* case from the nature of the "offer" to a "product" not being satisfactory. We quote the entire passage in the margin.[23]

The *City of Inglewood* definition was mostly repeated by the court in *Taylor Bus*, where the court cited *City of Inglewood, supra*, 7 Cal.3d at page 867, for a definition that defined responsibility in three of the four words used by *City of Inglewood*. (*Taylor Bus, supra*, 195 Cal.App.3d at p. 1341, fn. 4 ["Responsibility means the fitness, quality and capacity of the bidder to satisfactorily perform the proposed work."].)

### b. The Nature of Responsiveness

#### i. *responsiveness: the definition*

██ *Taylor Bus* was the first California case to attempt a formal definition of bid responsiveness, as shown by its need to cite to a Seventh Circuit opinion from the Midwest, *James Luterbach Constr. Co. v. Adamkus* (7th Cir. 1986) 781 F.2d 599 (*Luterbach*) for the definition: "A bid is responsive if it promises to do what the bidding instructions demand." (*Taylor Bus, supra*, 195 Cal.App.3d at p. 1341, citing *Luterbach, supra*, 781 F.2d at p. 601.)

*Taylor Bus* then went on to elaborate on the nature of nonresponsiveness, contrasting it with nonresponsibility. (*Taylor Bus, supra*, 195 Cal.App.3d at pp. 1341–1342.) It is from that swath of text that the ideas emerge that responsibility is a (1) "complex matter dependent, often, on information received outside the bidding process and requiring, in many cases, an application of subtle judgment" whereas (2) responsiveness is "less complex"

---

[23] First, here is the main text: "There is no basis for the application of a relative superiority concept under that section, and *if petitioners applied such standard in selecting Swinerton rather than Argo as the contractor the award cannot stand.*" (*City of Inglewood, supra*, 7 Cal.3d at p. 867, italics added.)

To that sentence, the high court appended this footnote, shifting the focus of *West*: "*West* v. *Oakland, supra*, 30 Cal.App. 556, 560, states: 'The term "lowest responsible bidder" has been held to mean the lowest bidder whose offer *best* responds in quality, fitness, and capacity to the particular requirements of the proposed work.' (Italics added.) While it is possible to interpret the use of the term 'best' as meaning that the standard to be applied is one of relative superiority, an examination of the holding of *West* as well as other cases which quote its language (e.g., *Raymond* v. *Fresno City Unified Sch. Dist., supra*, 123 Cal.App.2d 626, 629) reveals that this is not the intention since these cases hold that the lowest bidder was properly rejected as not responsible either because (as in *West*) his product was not satisfactory or (as in *Raymond*) because he was found to have provided poor workmanship in another public project." (*City of Inglewood, supra*, 7 Cal.3d at pp. 867–868, fn. 5.)

and "can be determined from the face of the bid." (*Ibid.*) The *Taylor Bus* court thus said: "In most cases, the determination of nonresponsiveness will not depend on outside investigation or information and a determination of nonresponsiveness will not affect the reputation of the bidder." (*Id.* at p. 1342.)

That qualifying hedge—"In most cases"—for the idea that responsiveness does not depend on investigation, was picked up by the court in *Valley Crest, supra,* 41 Cal.App.4th 1432, in a general introductory discussion of bid law. The *Valley Crest* court translated "In most cases" into the word "usually" in a passage that cited page 1342 of *Taylor Bus*: "Usually, whether a bid is responsive can be determined from the face of the bid without outside investigation or information." (*Valley Crest, supra,* 41 Cal.App.4th at p. 1438.) The "usually" passage from *Valley Crest* was quoted verbatim a short time later by the court in *MCM, supra,* 66 Cal.App.4th at page 368.

Not surprisingly, the District here relies on the "usually" passage from *MCM* (which itself was taken from *Valley Crest*'s paraphrase of the "In most cases" language from *Taylor Bus*) as a lynchpin of its argument in the case before us. After all, Great West's bid was summarily rejected as nonresponsive only after an *external investigation* (to be sure, a very cursory external investigation)—a fact that would normally indicate that the substance of the District's rejection of Great West's bid was for nonresponsibility. Well, yes, the District seems to say: *Most* of the time investigation beyond the face of the bid is a matter of responsibility, not responsiveness. But here, the District says (in a footnote in its brief), the substantive falsity of the "no" answer to the question of any additional licenses takes this case out of the usual variety.

As we now show: No. In fact, the allegation of falsity only underscores the fact that the rejection here went to nonresponsibility, not nonresponsiveness.

### ii. *responsiveness: the practice*

Let us emphasize now: We most certainly do *not* disagree with *Taylor Bus*'s judicially cautious qualifying language, echoed in *Valley Crest* and then repeated in *MCM,* that *usually* the question of responsiveness can be determined simply by looking exclusively at the face of the bid. Thus we do not, in this case, articulate an absolute rule. And, perhaps, one day there will come a case where the determination of whether a bid is *truly* nonresponsive—as distinct from where the bid implicates nonresponsibility—will require going beyond the face of the bid.

That said, no such example is found in the case law. And this case is certainly not a good candidate to be the first.

The cases directly dealing with whether a given bid was truly nonresponsive are, to date: *Taylor Bus, supra*, 195 Cal.App.3d 1331; *Pacific Bell, supra*, 225 Cal.App.3d 107; *Domar Electric II, supra*, 41 Cal.App.4th 810; *M & B, supra*, 68 Cal.App.4th 1353; *D.H. Williams, supra*, 146 Cal.App.4th 757; and, most recently, *Cypress Security, supra*, 184 Cal.App.4th 1003.[24]

In all of the cases where a public entity's determination that a bid was nonresponsive was upheld, the determination of nonresponsiveness was readily ascertainable *on the face of the bid.* In *Taylor Bus*, the school district required at least a $10 million comprehensive liability insurance ("CGL" in insurance law) policy. The lowest bidder proffered a $10 million "insurance trust," which, noted the *Taylor Bus* court, entailed "the acceptance of different risks." (*Taylor Bus, supra*, 195 Cal.App.3d at p. 1344.) In *Pacific Bell*, the solicitation by the state agency was for the acquisition of a system "by purchase only" with a specific exclusion for "any proposals for acquisition by lease." The losing bidder just went ahead and proposed a leased system anyway. (*Pacific Bell, supra*, 225 Cal.App.3d at pp. 110–111.) In *Domar Electric II*, the bid request required documentation of compliance with an outreach program as defined in a " 'good faith documentation checklist.' " (*Domar Electric II, supra*, 41 Cal.App.4th at p. 819.) The losing bidder simply "failed to provide the required good-faith-effort documentation" within the deadline. (*Ibid.*) In *M & B*, the bidding instructions plainly required that all bidders have a "class 'A' " license. The losing bidder listed only class "B" and class "C" licenses. (*M & B, supra*, 68 Cal.App.4th at p. 1357.)

---

[24] There are, of course, a number of other cases whose main focus was on two other aspects of the problem:

(1) whether the *scope* of the statutory authority allowed the public entity to require a given term in a bid in the first place (e.g., *Domar Electric I, supra*, 9 Cal.4th 161 [city could validly require compliance with contractor outreach program]; *Monterey Mechanical, supra*, 44 Cal.App.4th 1391 [sanitation district precluded from going beyond statutory criteria to satisfy affirmative action goal]; *Pacific Bell, supra*, 225 Cal.App.3d 107 [scope of special statute governing procurement of data-processing and telecommunications services]); or

(2) whether the public entity had discretion to *excuse* clear nonresponsiveness readily ascertainable from the face of the bid (e.g., *Menefee, supra*, 163 Cal.App.3d 1175 [county had discretion to excuse lowest bidder's failure to sign because bid was still binding]; *Konica, supra*, 206 Cal.App.3d 449 [university did not have discretion to excuse deviation from required performance specifications]; *Valley Crest, supra*, 41 Cal.App.4th 1432 [city had no discretion to excuse 33 percent deviation from 50 percent no-subcontracting requirement]; *Ghilotti, supra*, 45 Cal.App.4th 897 [city did have discretion to excuse 5.5 percent deviation from 50 percent no-subcontracting requirement]; *MCM, supra*, 66 Cal.App.4th 359 [city did not have discretion to waive deviation from requirement to list all subcontractors]; *Cypress Security, supra*, 184 Cal.App.4th at pp. 1015–1018 [city had discretion to (a) determine bid was not nonresponsive as to price because evaluator could still make straight-line comparison with rival's bid; (b) determine that exceeding page limit was not material deviation; and (c) look to other evidence of financial strength despite absence of required certified financial statements]).

By contrast, investigation *was* required by the public entity in *D.H. Williams* to assert that the losing bidder's bid was nonresponsive. The court there readily concluded that the real reason was an assertion of nonresponsibility. As we now explain.

### 4. D.H. Williams *Shows the Rejection Here Was for Nonresponsibility, Not Nonresponsiveness*

#### a. The *D.H. Williams* Factors

And so now to *D.H. Williams*: A school district requested bids on concrete and fencing work for a new educational center. The bid instructions required listing of all subcontractors, but did not explicitly require the listing of only licensed subcontractors. The lowest bidder listed a particular subcontractor, but that subcontractor's license had expired. The district staff checked the license status of that subcontractor, and requested a faxed response to the problem of the expired license. The lowest bidder then immediately substituted itself for the work to be done by the unlicensed subcontractor. The staff was unimpressed, though, and recommended the lowest bidder's bid be rejected as nonresponsive. The board agreed with the staff and awarded the contract to the next lowest bidder. The lowest bidder sought a writ of mandate to have the contract rescinded and have it awarded the contract. (*D.H. Williams, supra*, 146 Cal.App.4th at pp. 761–762.) The trial court agreed, and issued a judgment stopping all work by the second-lowest bidder, and requiring the contract be awarded to the lowest bidder. The district appealed.[25]

The appellate court agreed with the trial court that the school district had incorrectly rejected the lowest bidder's bid as nonresponsive when the bidder had really been rejected as nonresponsible. As such, the lowest bidder was entitled to at least a "due process hearing" on the purported nonresponsiblity. (*D.H. Williams, supra*, 146 Cal.App.4th at p. 772.)[26]

---

[25] By this time the work had been "substantially concluded" by the second-lowest bidder (see *D.H. Williams, supra*, 146 Cal.App.4th at p. 763, fn. 2).

[26] While the appellate court agreed with the trial court on the responsiveness-responsiblity issue, it reversed the judgment requiring the contract be awarded to the lowest bidder, and directed the trial judge to order the school district to offer the contract to the lowest bidder within 15 days, unless before the 15 days were up the District provided notice to the lowest bidder that its deemed it not responsible and offered the lowest bidder a due process hearing on that determination. (*D.H. Williams, supra*, 146 Cal.App.4th at p. 772.) The *D.H. Williams* court reasoned that in requiring the school district to award the contract to the lowest bidder directly, the trial court deprived the school district of the opportunity to determine whether the lowest bidder really was responsible. Obviously if not, the school district would be under no obligation to award it the contract.

■ In the process, the *D.H. Williams* court employed five factors in determining that the rejection of the bid before it was, in "legal effect," for nonresponsibility rather than nonresponsiveness.

Before we list those factors, let us hasten to add one threshold matter: literal compliance with the bid request. In *D.H. Williams*, the losing lowest bidder complied with the *literal* language of the bid request. (See *D.H. Williams, supra*, 146 Cal.App.4th at pp. 764, 769–770 [making the point that the bid package "[did] not require" listing of only licensed subcontractors].) We thus recognize, as one can derive from the ordinary nonresponsive bidding cases (*Taylor Bus, Pacific Bell, Domar Electric II*, and *M & B*) that literal noncompliance with a bid request does indeed make a bid nonresponsive.[27]

That said, the following *D.H. Williams* factors are for situations where, as in *D.H. Williams*, there is literal compliance, but the public entity still claims the bid was nonresponsive. Here they are:

(1) *The complexity of the problem and the ensuing need for subtle administrative judgment.* (See *D.H. Williams, supra*, 146 Cal.App.4th at p. 766; see also *id.* at p. 764, quoting *Taylor Bus, supra*, 195 Cal.App.3d at pp. 1341–1342 [contrasting responsibility determination as a complex process with responsiveness determination as practically a ministerial one involving no exercise of agency discretion].)

(2) *The need for " 'information received outside the bidding process.' "* (*D.H. Williams, supra*, 146 Cal.App.4th at p. 764, italics added, quoting *Taylor Bus, supra*, 195 Cal.App.3d at pp. 1341–1342.)

(3) *Whether the problem is the sort that is susceptible to categorical hard and fast lines, or whether it is better handled on a "case-by-case" basis.* (See *D.H. Williams, supra*, 146 Cal.App.4th at p. 767 [noting that problem of erroneous listing of unlicensed subcontractor required case-by-case determination].)

(4) *The potential for " 'adverse impact on the professional or business reputation of the bidder.' "* (*D.H. Williams, supra*, 146 Cal.App.4th at p. 764,

---

In the present case, the District has made no request that, in the event of reversal, the trial court should be ordered to require the District to, as in *D.H. Williams*, first provide notice that Great West is deemed not responsible and then offer Great West a due process hearing on that determination. Nor do we have any need to opine on any possible future due process hearing on remind after reversal. That question is, at this moment, premature.

[27] Perhaps we should, following *Taylor Bus*'s example, insert the idea of "usually." But we will leave that task to the future, if at all. It is, however, interesting to note that just as there are no cases where nonresponsiveness was found by going outside the four corners of the bid, so are there no cases where a determination of nonresponsibility could be based on literal noncompliance with the bid request.

italics added, quoting *Taylor Bus, supra,* 195 Cal.App.3d at pp. 1341–1342; see also *D.H. Williams, supra,* 146 Cal.App.4th at p. 766 [noting a determination that a contract intentionally listed an unlicensed subcontractor was a "serious matter"].)

(5) *The potential that "innocent bidders" are subject to "arbitrary or erroneous disqualification from public works contracting." (D.H. Williams, supra,* 146 Cal.App.4th at p. 766, italics added; *id.* at p. 767.) [This factor was also restated as whether any "purpose of the Public Contract Code would be served" by the disqualification of the bid.]

### b. Application of the Relevant Factors

■ As a threshold matter, we observe that Great West, as did the lowest bidder in *D.H. Williams,* complied literally with the bid request. There was a question. Great West answered it. Period. The District in fact concedes as much in a footnote in its brief, where it hangs its hat on the purported falsity of the answer, not its nonexistence.

Turning then to the application of the *D.H. Williams* factors, we find they all support the conclusion that the District's rejection of Great West's bid was "in legal effect" for nonresponsibility, not nonresponsiveness.

*The complexity of the problem and the ensuing need for subtle administrative judgment.* Quite obviously, the District's concern in asking for all related and associated licenses went directly to a valid concern that contracts only go to the lowest *responsible* bidder. The question was asked so the District could check up on the history of is bidders so it could see whether, as in *Raymond,* the contractor had a history of shoddy workmanship.

However, the question of whether a shoddy contractor might *hide* its past by answering "no" to the associated license question or whether—as in *D.H. Williams*—the listing might be the result of inadvertence or oversight, is a question of some complexity necessarily requiring some administrative judgment. There is an obvious difference between an innocent forgetting to list some joint venture that an employee might have been involved in years ago and the deliberate concealment of the fact that a license was yanked or suspended for misconduct. But that requires some investigation and factfinding. And of course puts the matter in the "responsibility" as distinct from "responsive" category.

*The need for " 'information received outside the bidding process.' "* Great West's answer was responsive *on the face* of its bid. The District staff *had* to go outside the bidding process to derive the idea that the answer was false.

Not to give Great West a responsibility hearing under those circumstances effectively made the staff's initial determination the last word on the issue, and assumed the staff was infallible in its determination.

*Whether the problem is the sort that is susceptible of categorical hard and fast lines, or whether it is better handled on a "case-by-case" basis.* The problem of a purportedly false answer to a bid request as to associated licenses is quite different from the classic instances of nonresponsive bidding in the case law: We want $10 million worth of CGL insurance, not some flimsy substitute *(Taylor Bus)*. We want to buy the system; we don't want to lease it from you *(Pacific Bell)*. We want you to have a subcontractor outreach program, not just ignore that request *(Domar Electric II)*. And we want you to tell us who your subcontractors are, not just leave the space blank *(M & B)*. By contrast, the purported failure to disclose an associated license (particularly any that were related to joint ventures or which go back over 15 years and which may not substantively reflect on the bidder's conduct) is a matter much more suited to a hearing, factfinding and administrative judgment, rather than summary rejection based on staff checking.

*The potential for " 'adverse impact on the professional or business reputation of the bidder.' "* In this case the District rejected Great West's bid for dishonesty. Need we say more?

*The potential that "innocent bidders" are subject to "arbitrary or erroneous disqualification from public work contracting."* Rejection for purportedly not disclosing *associated* licenses is, as the facts of this case may show, particularly vulnerable to abuse: While the question does reflect a valid public entity interest in ascertaining the history of any bidder (a fact which itself points toward responsibility, not responsiveness), it can readily serve as a trap for the unwary and a conduit for favoritism. Rejection on that basis *without a hearing* smells of a concerted effort by the District to find some reason, any reason, to reject the lowest bidder's contract. And particularly here, where there is at least the allegation *(never squarely confronted by the District)* that it used a double standard in evaluating Great West's bid and the winners' bids.

Clearly then, the District was incorrect in rejecting Great West's lowest bid as nonresponsive. By the same token, the trial court erred in agreeing with the District.

### C.   The Proposed Amended Pleading

Having now determined that the Irvine Unified School District incorrectly summarily dismissed Great West's bid as "nonresponsive," certain conclusions flow: Primarily, as shown in *D.H. Williams*, Great West was entitled to

a hearing that it didn't get, and that hearing should have been afforded *prior* to the District's *not* awarding it the contract. Under *Kajima, supra*, 23 Cal.4th 305, Great West *may* be entitled to recover its bid preparation costs, depending, of course, on what the results of the hearing to which it was entitled would have been.

But that claim is getting ahead of ourselves.[28] For the moment, all we have to do is ascertain whether the trial court abused its discretion in rejecting Great West's admittedly belated request to amend.

The answer is: The order must be reversed so that the trial court can make its decision in light of the correct law. In denying the request to amend, the trial court operated under two incorrect assumptions:

First, it categorically assumed that the District was correct in summarily rejecting Great West's bid as nonresponsive. As we have showed at length, under *D.H. Williams*, Great West was entitled to a hearing on its responsibility.

Two, the trial court categorically assumed that the allegations of unequal treatment against Great West and in favor of the two winners were of no relevance to the case. As we have shown, to accept that point is to give the District the benefit of its own wrong in withholding requested information until after it could be timely included in Great West's moving papers.

An exercise of discretion cannot be upheld when it is founded on incorrect legal premises. As the court said in *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393 [33 Cal.Rptr.3d 644]: "But a reasoned decision based on the reasonable view of the scope of discretion is still an abuse of judicial discretion *when it starts from a mistaken premise*, even though nothing about the exercise of discretion is, in ordinary-language use of the phrase, 'beyond the bounds of reason.' " (Italics added.)

Other authorities to the same effect are: *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298 [255 Cal.Rptr. 704] ("If the trial court is mistaken about the scope of its discretion, the mistaken position may be 'reasonable', i.e., one as to which reasonable judges could differ. . . . But if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law."); *Costa Serena Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1203 [97 Cal.Rptr.3d 170] ("Here, the trial court appears to have erroneously interpreted the UDoR, and on this basis, rejected some of the consent forms. In doing so, the

---

[28] We need not speculate at this juncture about the precise extent of any future claims by Great West against the District.

court incorrectly applied legal principles of contract interpretation. The trial court's evidentiary rulings premised on its erroneous interpretation constitute an abuse of the court's discretion."); *Olsen v. Harbison* (2005) 134 Cal.App.4th 278, 285 [35 Cal.Rptr.3d 909] ("There are two ways to show an abuse of discretion by the trial court. One way is to show the ruling was whimsical, arbitrary, or capricious, i.e., that the trial court exceeded the bounds of reason. . . . The other way is to show the trial court erred in acting on a mistaken view about the scope of its discretion." (citation omitted)); *Perko's Enterprises, Inc. v. RRNS Enterprises* (1992) 4 Cal.App.4th 238, 245 [5 Cal.Rptr.2d 470] ("The trial court's order denying Perko's motion to tax costs provides no explanation of the basis for its decision. It appears the court incorrectly believed it had no authority to disallow the filing fee as a cost. We will, therefore, remand the issue of costs in order to allow the trial court to determine the reasonableness of the filing fee and to exercise its discretion in accordance with this opinion.").

## IV. DISPOSITION

The judgment is reversed to the extent it incorporates the order denying Great West's request to amend its petition to state a prayer for relief for its bid preparation costs under *Kajima*. The case is remanded for further proceedings consistent with this opinion. Great West will recover its costs on appeal.

Bedsworth, J., and Ikola, J., concurred.

### SUPPLEMENTAL OPINION ON DENIAL OF REHEARING*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

A petition for a rehearing was denied September 30, 2010, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 1, 2010, S187228.

---

* See footnote, *ante,* page 1425.